UNITED STATES of America, Appellee,

v.

Celestino FIGUEROA, a/k/a "El Indio", a/k/a "Charlie", Amado Lopez, a/k/a "La Sangre", Joseph Diaz, a/k/a "Joe", a/k/a "Frank", a/k/a "Pancino", Defendants-Appellants.

Nos. 366, 244, 245, Dockets 84–1178, 84–1204, 84–1205.

United States Court of Appeals, Second Circuit.

Argued Oct. 25, 1984.

Decided March 7, 1985.

Donald E. Nawi, New Rochelle, N.Y., for defendant-appellant Figueroa.

J. Jeffrey Weisenfeld, New York City (Goldberger & Dubin, New York City, of counsel), for defendants-appellants Diaz and Lopez.

Mary Lee Warren, Asst. U.S. Atty., S.D. N.Y., New York City (Benito Romano, Asst. U.S. Atty., Rudolph W. Giuliani, U.S. Atty., S.D.N.Y., New York City, of counsel), for appellee U.S.

Before FRIENDLY, PIERCE and PRATT, Circuit Judges.

PRATT, Circuit Judge:

Defendants appeal from judgments of the United States District Court for the Southern District of New York, Robert J. Ward, *Judge,* convicting them of violating 21 U.S.C. § 846 upon conditional pleas of guilty. With the government's consent defendants preserved for appeal the wiretap issues of whether Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. §§ 2510–20 (1982) (Title III), is constitutional on its face and as applied. In addition, defendant Figueroa contends that the district court abused its discretion in refusing to permit him to withdraw his plea of guilty. Finding no merit in any of these contentions, we affirm.

## BACKGROUND

In April 1983 the government applied to Judge Cale Holder of the United States District Court for the Southern District of Indiana for a wiretap order to intercept wire communications of Louis Inglese "and others as yet unknown", relating to the possession and distribution of narcotics, over two telephones located on separate floors of the alcohol treatment unit (ATU) of the United States Penitentiary—Terre Haute, in Terre Haute, Indiana. These telephones are specially adapted to permit only outgoing collect or credit card calls placed through an operator. Mounted above each telephone is a sign announcing that calls are subject to monitoring.

The application for the wiretap order stated that Inglese and others not yet known were using these two telephones in furtherance of the commission of various narcotics offenses, including conspiracy to distribute, distribution, possession with intent to distribute, and use of the wire facilities to aid the distribution and possession with intent to distribute. According to the application, Inglese, who had been convicted in 1974 of operating a major heroin distribution network center in New York City, *United States v. Tramunti,* 73 Cr. 1099 (S.D.N.Y.1973) (KTD), *aff'd,* 513 F.2d 1087 (2d Cir.1975), *cert. denied,* 423 U.S. 832, 96 S.Ct. 55, 46 L.Ed.2d 50 (1975), and is now serving a fifty-six year sentence at the prison, was directing an extensive narcotics distribution operation from inside the prison, primarily over the ATU telephones. Part of the operation concerned heroin distribution outside of the prison, and part involved narcotics trafficking inside the prison.

Confidential informants had reported that Inglese, assisted by other inmates working under him, most prominently Sam Cagnina and Carmine Romano, conducted the business outside the prison over the ATU telephones and through the mail, usually by using coded communications. According to these informants, the operation was primarily centered in and around New York City, and Inglese's main contact on the outside was his son, Pasquale, with whom he spoke frequently over the ATU telephones.

Other informants reported that Inglese, Cagnina, and Romano also controlled all of the narcotics trafficking within the prison, again arranging the drug buys over the ATU telephones, and that no narcotics transactions occurred there without their approval. According to one informant, contraband, including narcotics and weapons, was introduced into the prison through the mails on a regular basis. Another informant stated that Inglese was "always" on the telephone arranging drug deals.

That Inglese was conducting a New York distribution operation from inside the pris-

on was also reported by Leroy "Nicky" Barnes, formerly a notorious narcotics kingpin, *see United States v. Barnes*, 77 Cr. 190 (S.D.N.Y.1977) (HFW), *aff'd*, 604 F.2d 121 (2d Cir.1979), *cert. denied*, 446 U.S. 907, 100 S.Ct. 1833, 64 L.Ed.2d 260 (1980), who had been a close associate of Inglese while incarcerated at Terre Haute. Barnes stated that he had frequently observed Inglese using the ATU telephones, and had subsequently learned that the calls Inglese made had related to narcotics transactions.

Telephone toll records and a pen register analysis revealed that a number of calls had been made from the ATU to telephones in the New York City area used by Inglese's relatives and associates, and by others who were known narcotics dealers. Additional information contained in the wiretap application indicated that Inglese had also sought outside assistance to smuggle firearms into the prison.

Although the specific names of all those assisting Inglese were not known at the time the application was made, the government knew, based on the informants' information, that Inglese used other inmates to do his bidding. The government was therefore able to name seven individuals as "possible interceptees", including Cagnina and Romano, even though probable cause did not exist at that time to name any of them as violators using the designated telephones.

Judge Holder approved the application and issued an order authorizing the government, as part of its narcotics investigation, to intercept communications over these telephones involving Inglese and "others as yet unknown". The order further stated that these interceptions

> shall not automatically terminate when the type of communications [described in the government's application] has first been obtained but shall continue until communications are intercepted which fully reveal the manner in which LOUIS INGLESE * * *, and others as yet unknown, participate in the above-described offenses and which reveal the identities

of their confederates, their places of operation and the nature of the conspiracy involved therein or for a period of thirty (30) days from the date of this order, whichever is earlier.

Almost all the calls monitored between April 12th and May 9th that were highlighted by the government in its report to Judge Holder were made by Inglese, Cagnina, Orlando Hernandez, Alonzo Hodges, Hugh McIntosh, and appellant Diaz. Many times the callers used aliases to refer to themselves; often they spoke in Spanish or in "code". Diaz, himself, made approximately 21 of these reported calls, mostly to his wife, Haydee, in New York. The substance of his monitored calls contained in the government's report dealt primarily with ongoing narcotics transactions.

For example, the second reported call (the sixteenth call actually intercepted) was made by "an unidentified inmate using the name 'JOE'" (later identified as appellant Diaz) to Haydee Diaz in New York City. During the conversation, which was in Spanish and translated by a DEA interpreter, "JOE" complained that "it" had not yet arrived from a third person, "AMATO", and "JOE" needed assurances of the promised delivery because doubts were being raised "here" (in the prison). The next day, an inmate using the name "TONY", but also believed to be Diaz, spoke to someone in Miami, apparently "AMATO", who is appellant Lopez. When "TONY" complained of delay, "AMATO" gave excuses about being unable to contact a third party. "TONY" then put Cagnina on the telephone and "AMATO" repeated the excuses to him. "TONY" then got back on the phone, and told "AMATO" to go see the third party and ask him "if he has clothes for you and nothing else, we're interested to see what he says * * * tell him you have to get me 2 pairs of shoes * * * if he says yes, ask him when * * * just show up over there, the guy won't talk on the phone * * *." "TONY" then said that he had spoken to someone the night before and had told her to see a friend and "get one shirt * * * in one week we will have it back

* * *." The "clothes", "two pairs of shoes", and "one shirt" referred to in these conversations were apparently coded references to different quantities of narcotics.

In light of these and other incriminating calls, the government, in its first application for a thirty-day extension of the wiretap order, specifically named appellants Diaz and Lopez as additional individuals who were using wire communications to commit the named narcotics offenses, and the court, finding that probable cause existed to believe that they were in fact doing so, incorporated both Diaz and Lopez into its extension order as targets of the surveillance.

Pursuant to the original and two extension orders, the interceptions continued through July 7, 1983. Among the participants in intercepted conversations concerning narcotics was one "el Indio," later identified as defendant Figueroa. Based in large part on the information obtained in these interceptions, Judge William C. Conner of the Southern District of New York issued an order on June 22 authorizing interception of communications over the telephone of Diaz's wife, Haydee, and adding, among others, "JOHN DOE, a/k/a 'el Indio (the Indian)' " to the ever growing list of individuals as to whom there existed probable cause of illegal trafficking in narcotics. Those interceptions continued from June 22, 1983 until July 1, 1983. In addition, DEA and FBI agents, pursuant to warrants, searched Diaz's prison cubicle on July 5, and the residence of Haydee Diaz on July 7.

A fifteen-count indictment was then filed in the Southern District of New York charging appellants and others in various combinations with narcotics violations under 21 U.S.C. § 843(b) and § 846. Appellants moved below to suppress the evidence obtained from the electronic surveillances on the grounds now asserted on appeal. After Judge Ward denied these motions, Diaz, Lopez, and Figueroa pled guilty to conspiracy to violate the narcotics laws in violation of 21 U.S.C. § 846. Diaz also pled guilty to attempting to distribute narcotics

in violation of 21 U.S.C. § 846. All three preserved their right to appeal the wiretap issues.

Before sentencing, Figueroa moved pursuant to Fed.R.Crim.P. 32(d) to withdraw his guilty plea, but Judge Ward denied the motion and sentenced him to four years. He sentenced Diaz to two concurrent fifteen-year terms of imprisonment to run consecutively to the term he was then serving. Lopez was sentenced to thirteen years' imprisonment. These appeals followed.

### DISCUSSION

Appellants contend that Title III does not permit electronic surveillance of persons who are not specifically named in a wiretap order but who are merely referred to as "others as yet unknown"; that if Title III does allow such surveillance, the statute is unconstitutional on its face because it permits "general warrants" to issue in violation of the fourth amendment; and that even if not unconstitutional on its face, it is unconstitutional as applied in these circumstances. These contentions lack merit.

I. *Statutory Arguments.*

■ Title III provides comprehensive procedures for authorizing electronic surveillance, for proper monitoring by law enforcement officials, and for ongoing judicial supervision of the authorized surveillance. Section 2518(1) details the information required to be set forth in a wiretap application. Section 2518(1)(b)(iv) calls for "the identity of the person, *if known,* committing the offense and whose communications are to be intercepted". (Emphasis added). Similarly, under § 2518(4)(a) the order authorizing the interception must specify "the identity of the person, *if known,* whose communications are to be intercepted". (Emphasis added). The language of both sections, therefore, anticipates interception of calls of people whose identities are not known at the time of the application and order. "The clear implication of this language is that when there is probable cause to believe that a particular

telephone is being used to commit an offense but no particular person is identifiable, a wire interception order may, nevertheless, properly issue under the statute." *United States v. Kahn*, 415 U.S. 143, 157, 94 S.Ct. 977, 985, 39 L.Ed.2d 225 (1974). Innocent parties are protected from unreasonable surveillance by the requirement contained in § 2518(5) that surveillance "shall be conducted in such a way as to minimize the interception of communications not otherwise subject to interception * * *." *See Scott v. United States*, 436 U.S. 128, 130–31, 98 S.Ct. 1717, 1719–20, 56 L.Ed.2d 168 (1978).

At the time this application was made to Judge Holder, the only person "known" by law enforcement authorities to be committing the described offenses was Louis Inglese. In support of its claim that the calls of "others unknown" should also be intercepted, the government identified seven other people as "possible interceptees". In his order, Judge Holder, "[i]n an abundance of caution" referred to those seven possible interceptees, "although probable cause does not exist *at this time* to name them as violators using the designated telephones". (Emphasis by the court). As indicated above, under §§ 2518(1)(b)(iv) and 2518(4)(a) interception of the appellants' calls was authorized even though they were not then "known" to be committing the narcotics crimes.

In *United States v. Kahn*, a wiretap application established probable cause to believe that Mr. Kahn was involved in a gambling enterprise and that he used his home telephone to conduct that enterprise. The order granting the application permitted interceptions over this phone of Kahn's conversations and, as here, those of "others as yet unknown". Mrs. Kahn challenged the interception of telephone calls over the same phone between herself and third parties. The Supreme Court held that her conversations were admissible under the statute as those of "others as yet unknown", concluding that Title III required the naming of individuals only if known to be "actually committing one of

the offenses [specified in the statute]." 415 U.S. at 152, 94 S.Ct. at 982.

Since appellants' statutory argument here rests solely on the fact that the order permitted interception of conversations of "others as yet unknown"—they do not contend that any of Title III's other requirements were violated—their statutory challenge must therefore fail.

### II. *Facial Constitutionality of Title III.*

Next, appellants assert that Title III is facially invalid because it permits general warrants to issue in contravention of the fourth amendment.

In *Berger v. New York*, 388 U.S. 41, 87 S.Ct. 1873, 18 L.Ed.2d 1040 (1967), the Supreme Court held that electronic surveillance not based on probable cause or obtained without particularizing the scope and duration of the interceptions violates the fourth amendment. The following term, in *Katz v. United States*, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967), the court held that even narrowly circumscribed electronic surveillance must have prior judicial sanction and its attendant safeguards in order to satisfy fourth amendment requirements.

Title III was enacted, in large part, to meet the restrictions imposed on electronic surveillance practices and procedures by *Berger* and *Katz*. *See* S.Rep. No. 1097, 90th Cong., 2d Sess. 66 (1968), *reprinted in* 1968 U.S.Code Cong. & Ad.News 2112, 2161–63; *see also Scott v. United States*, 436 U.S. at 130, 98 S.Ct. at 1719. This comprehensive statutory scheme circumscribes the use of electronic surveillance by law enforcement officials and provides for detailed procedures to insure that any surveillance undertaken will comport with constitutional requirements. Although the Supreme Court has never explicitly held Title III constitutional, our circuit has previously upheld the statute against the claim that it was unconstitutional on its face, *United States v. Tortorello*, 480 F.2d 764, 771–75 (2d Cir.), *cert. denied*, 414 U.S. 866, 94 S.Ct. 63, 38 L.Ed.2d 86 (1973), as has every other circuit court that has addressed the

issue. *E.g., United States v. Turner,* 528 F.2d 143, 158–59 (9th Cir.), *cert. denied sub nom, Grimes v. United States,* 423 U.S. 996, 96 S.Ct. 426, 46 L.Ed.2d 371 (1975); *United States v. Sklaroff,* 506 F.2d 837, 840 (5th Cir.), *cert. denied,* 423 U.S. 874, 96 S.Ct. 142, 46 L.Ed.2d 105 (1975); *United States v. Ramsey,* 503 F.2d 524, 526–31 (7th Cir.1974), *cert. denied,* 420 U.S. 932, 95 S.Ct. 1136, 43 L.Ed.2d 405 (1975); *United States v. Martinez,* 498 F.2d 464, 467–68 (6th Cir.), *cert. denied* 419 U.S. 1056, 95 S.Ct. 639, 42 L.Ed.2d 654 (1974); *United States v. James,* 494 F.2d 1007, 1012–13 (D.C.Cir.), *cert. denied,* 419 U.S. 1020, 95 S.Ct. 495, 42 L.Ed.2d 294 (1974); *United States v. Bobo,* 477 F.2d 974, 978–82 (4th Cir.1973), *cert. denied sub nom, Gray v. United States,* 421 U.S. 909, 95 S.Ct. 1557, 43 L.Ed.2d 774 (1975); *United States v. Cafero,* 473 F.2d 489, 493–501 (3rd Cir. 1973), *cert. denied,* 417 U.S. 918, 94 S.Ct. 2622, 41 L.Ed.2d 223 (1974); *United States v. Cox,* 462 F.2d 1293, 1302–04 (8th Cir.1972), *cert. denied,* 417 U.S. 918, 94 S.Ct. 2623, 41 L.Ed.2d 223 (1974); *United States v. Cox,* 449 F.2d 679, 683–87 (10th Cir.1971), *cert. denied,* 406 U.S. 934, 92 S.Ct. 1783, 32 L.Ed.2d 136 (1972).

▉ More particularly, the mere fact that Title III allows interception of conversations of "others as yet unknown" does not render the statute unconstitutional on its face as authorizing a general warrant. *See United States v. Martinez,* 498 F.2d at 467–68; *United States v. Ramsey,* 503 F.2d at 526. As the Supreme Court pointed out in *United States v. Kahn,* 415 U.S. at 154–55 and n. 15, 94 S.Ct. at 983–84 and n. 15, just as the failure of an ordinary search warrant to name the persons from whom property is to be seized does not automatically render the warrant an invalid general warrant, a wiretap order which does not specify every person whose conversations may be intercepted does not *per se* amount to a "virtual general warrant" in violation of the fourth amendment. Instead, a court must analyze the facts of each case in order to determine whether the wiretap order and any monitoring searches under-

taken pursuant to it conform to fourth amendment requirements.

Appellants argue that the Supreme Court's decision in *Scott v. United States* in effect diminishes the minimization requirement to the point where Title III, on its face, is "subject to fourth amendment attack", citing Justice Brennan's dissent in *Scott,* 436 U.S. at 147–48, 98 S.Ct. at 1728 (" * * * as judicially 'enforced', Title III may be vulnerable to constitutional attack for violation of Fourth Amendment standards, thus defeating the careful effort Congress made to avert that result."). We disagree. Scott held that a violation of the minimization requirement contained in § 2518(5) "turns on an objective assessment of the officer's actions in light of the facts and circumstances confronting him at the time", 436 U.S. at 136, 98 S.Ct. at 1723, not merely on his subjective intent when he conducted the wiretap. The court further determined that, on the facts before it, the agents' conduct was reasonable and therefore did not violate either the statute or the fourth amendment. Notwithstanding the warning issued by Justice Brennan in dissent, we find nothing in *Scott* to persuade us that the minimization requirement has become so diluted as to render Title III unconstitutional on its face. Although the ATU telephones were used by more individuals than the private telephones tapped in *Kahn* or in *United States v. Donovan,* 429 U.S. 413, 97 S.Ct. 658, 50 L.Ed.2d 652 (1977), they were a far cry from public telephones used, *e.g.,* in a railway station or a bus terminal. More important, the telephones being tapped were prison telephones for use by prisoners; whatever prisoners' reasonable expectations of privacy may otherwise be, it is clear that incarceration greatly diminishes these with respect to contacts with the outside. *Cf. Hudson v. Palmer,* — U.S. —, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984). Moreover, these prisoners were on notice of the possibility that their calls were being monitored. Under such circumstances, a wiretap order that, in compliance with the requirements of Title III, authorizes police to intercept telephone calls made by unidentified per-

sons does not violate the fourth amendment. We therefore reject appellants' challenge to Title III and the particular order in this case on the ground of facial unconstitutionality; any possibility of success by appellants must, therefore, hinge on demonstrating that the government acted unreasonably in a particular instance in carrying out the order. *See Scott v. United States*, 436 U.S. at 139–41, 98 S.Ct. at 1724–25. To this question we now turn.

### III. *Constitutionality of Title III and the Wiretap Order as Applied.*

Because appellants were situated differently at the time of the interceptions, we shall analyze their claims separately.

#### A. *Diaz.*

■ Diaz placed calls from the ATU telephones. He argues that their interception, pursuant to the "others as yet unknown" provision of the wiretap order, violates the fourth amendment because it effectively converted the order into a "general warrant". In support of this contention, Diaz points out that the ATU telephones were at least quasi-public and available without restriction between the hours of 9:00 a.m. and 10:00 p.m. to the 59 inmates housed in the ATU, few of whom were named or otherwise implicated in its investigation. Consequently, he argues, the order issued by Judge Holder amounted to a "general warrant" because it permitted the interception of calls made by ATU residents, including himself, not specifically named in the order as targets of the investigation.

The fourth amendment proscribes searches and seizures that are unreasonable and also mandates that a warrant "particularly [describe] the place to be searched and the persons or things to be seized." *See United States v. Young*, 745 F.2d 733, 759 (2nd Cir.1984). Yet, we cannot conclude that the wiretap order here, which complied with the detailed requirements spelled out in Title III, amounted to a "general warrant". *See Kahn*, 415 U.S. at 155 n. 15, 94 S.Ct. at 984 n. 15; *see also United States v. Donovan*, 429 U.S. 413,

427 n. 15, 97 S.Ct. 658, 668 n. 15, 50 L.Ed.2d 652 (1977).

The record reveals that the second reported telephone call intercepted on the very first day of monitoring was made by Diaz and that the ensuing conversation, although in "code", could reasonably have been construed to relate to narcotics trafficking within the prison. Further, a call made the next day by Diaz to Lopez in Miami tied Diaz to Cagnina, who was named in the application as a confidant of Inglese and in the order as a "possible interceptee", and also implicated Diaz in narcotics trafficking being conducted both inside and outside the prison.

■ Interception of these two narcotics-related calls did not violate either the statute or the fourth amendment. At the outset of a wiretap, surveillance under an order that authorizes interception of calls of "others as yet unknown" is not strictly limited to only those who are specifically named in the authorizing order either as probable violators or as possible interceptees; this is particularly so where an investigation, such as this one, is directed at a wide-spread narcotics conspiracy. *See Scott v. United States*, 436 U.S. at 140, 98 S.Ct. at 1724; *United States v. Manfredi*, 488 F.2d 588, 599 (2d Cir.1973), *cert. denied*, 417 U.S. 936, 94 S.Ct. 2651, 41 L.Ed.2d 240 (1974); *United States v. James*, 494 F.2d at 1019. The agents are required only to make reasonable efforts to minimize their interceptions in light of all the relevant circumstances. *Scott*, 436 U.S. at 139–41, 98 S.Ct. at 1724–25; *James*, 494 F.2d at 1018–19. Consequently, in the absence of any claim that the agents failed to minimize their interceptions, the government's interception of these two calls was not unreasonable.

Moreover, these two intercepted telephone calls sufficiently tied Diaz to the narcotics trafficking described in the wiretap order to justify continued monitoring of Diaz's subsequent telephone calls. From these and the subsequent calls it quickly became clear that Diaz was one of the "others as yet unknown" who were engag-

ing with Inglese in narcotics operations; therefore, it was reasonable for the government to continue to monitor and intercept his telephone calls during the remainder of the period authorized by the original order. Except as forbidden fruits of interceptions under the first order, appellants do not challenge the evidence obtained in the extension orders, because there the government did include Diaz as a specific target of the investigation, and probable cause for his involvement in the narcotics trafficking under investigation had been firmly established by the earlier intercepts.

In short, the government's course of conduct toward Diaz was reasonable. The fact that these two telephones were accessible to many other inmates does not change the result. The wiretap order authorized interception of only narcotics and related conversations of certain individuals, some of them unnamed, and the government's interceptions appear to have been carefully circumscribed. *Cf. United States v. Rizzo,* 492 F.2d 443, 447 (2d Cir.1974) (where wiretapped pay phones were not used by the general public but were being used exclusively by defendant and his associates for their personal benefit there can be no claim that the public's privacy was inadequately protected).

*Ybarra v. Illinois,* 444 U.S. 85, 100 S.Ct. 338, 62 L.Ed.2d 238 (1979), relied on heavily by Diaz, does not persuade us otherwise. In *Ybarra,* information provided by an informant gave the police probable cause to believe that the bartender at a local tavern was selling heroin from behind the bar. Based on this information the judge issued a search warrant authorizing a search of the tavern and the bartender. While executing the warrant, the police conducted a pat-down of all the patrons, characterized as "a cursory search for weapons." *Id.* at 88, 100 S.Ct. at 341. As a result, the police discovered on Ybarra a cigarette pack that contained packets of heroin. Ybarra's conviction of possessing the heroin was reversed by the Supreme Court, which concluded that the seizure of the heroin packets violated the fourth and fourteenth amendments, based on the fact that the authorities had no reason to believe that any person found on the premises of the tavern, aside from the bartender who was named in the warrant, would be violating the law. *Id.* at 90–92, 100 S.Ct. at 341–343.

In support of his claim here, Diaz seizes upon language in Ybarra's majority opinion which explains that "[w]here the standard is probable cause, a search or seizure of a person must be supported by probable cause particularized with respect to that person. This requirement cannot be undercut or avoided by simply pointing to the fact that coincidentally there exists probable cause to search or seize another or to search the premises where the person may happen to be." *Id.* at 91, 100 S.Ct. at 342.

Without passing on the validity of this argument where there is probable cause to believe that "others as yet unknown" will be committing the offense at the place to be searched, which the Court reserved in *Ybarra,* 444 U.S. at 92 n. 4, 100 S.Ct. at 342 n. 4, appellants' point is inapposite here. As the Supreme Court has explained, " 'the specific content and incidents of th[e] right [to be free from unreasonable searches and seizures] must be shaped by the context in which it is asserted.' " *Wyman v. James,* 400 U.S. 309, 318, 91 S.Ct. 381, 386, 27 L.Ed.2d 408 (1971) (quoting *Terry v. Ohio,* 392 U.S. 1, 9, 88 S.Ct. 1868, 1873, 20 L.Ed.2d 889 (1968)). The search conducted in this case took place in a prison as distinguished from the public bar in *Ybarra,* and as noted above, the expectations of privacy of prisoners are considerably diminished from those of ordinary citizens. *Hudson v. Palmer,* —— U.S. ——, 104 S.Ct. 3194, 3200–02, 82 L.Ed.2d 393 (1984). Consequently, the actions of the agents in this case, acting under a proper wiretap order, did not violate the fourth amendment rights of Diaz. Our conclusion in this respect is strengthened by the fact that a sign over the telephone indicated that calls were subject to being monitored.

If the government had failed to minimize its interceptions, this might be a closer case, for in situations such as this one, the

government must be especially scrupulous, as it was here, in its minimization efforts. *See United States v. James,* 494 F.2d at 1020. In any event, defendants have raised no minimization claim, and, absent any other specific challenge to the wiretap order or to the government's conduct in carrying it out, we cannot conclude that Diaz's fourth amendment rights were violated here.

#### B. *Lopez and Figueroa.*

The claims of appellants Lopez and Figueroa rest on somewhat different grounds. They were recipients of calls placed by Diaz; thus they were not inside the prison at the time their telephone conversations were intercepted, and the concerns surrounding the wiretapping of two quasi-public prison telephones used by 59 inmates do not apply to them. Moreover, they were conversing with prisoners whose calls were covered by the wiretap order, and the reference to "others as yet unknown" in the first order included individuals outside the prison such as Lopez and Figueroa.

■ As to Lopez, almost all of his conversations with Diaz occurred after the first extension order in which both Diaz and Lopez were named as targets. The few conversations that occurred during the period of the original order which named neither of them were properly intercepted for the same reasons discussed above in connection with Diaz. Significantly, the second of Diaz's monitored calls was to Lopez ("AMATO") and by itself established reasonable justification for further monitoring. Furthermore, "the government need not establish probable cause as to all participants in a conversation. If probable cause has been shown as to one such participant, the statements of the other participants may be intercepted if pertinent to the investigation." *United States v. Tortorello,* 480 F.2d at 775.

As to Figueroa, since all of his intercepted conversations with Diaz occurred after Diaz had been specifically named in the wiretap order, the interception of his conversations did not violate the fourth amendment. *Id.*

#### IV. *Withdrawal of Guilty Plea.*

Figueroa also contends that the district court abused its discretion in denying his motion to vacate the guilty plea, made almost three weeks after his plea had been accepted by the court. We find no merit in this claim.

■ Under Fed.R.Crim.P. 32(d), a defendant is permitted to move to withdraw his guilty plea prior to sentencing, although he "has no absolute right" to do so. *United States v. Burnett,* 671 F.2d 709, 712 (2d Cir.1982). To succeed on the motion, a defendant must satisfy the trial judge that valid grounds for withdrawal exist, and that such action is "fair and just", taking into account any prejudice the government may suffer as a result. *Id.* Whether the motion to withdraw the plea should be granted is a question addressed to the broad discretion of the trial court. *United States v. Saft,* 558 F.2d 1073, 1083 (2d Cir.1977).

■ The reasons urged by Figueroa to support his withdrawal motion boil down to a change of heart prompted by a reevaluation of the government's case against him; but these do not constitute sufficient justification to overturn the district court's broad discretion in this area. *See United States v. Michaelson,* 552 F.2d 472, 476 (2d Cir.1977). Figueroa entered his initial plea voluntarily, fully knowing the possible consequences of such a plea; he also admitted in open court that he had been involved in the narcotics distribution operation. *See United States v. Saft,* 558 F.2d at 1082. He does not now advance any compelling reasons or facts in support of his claim of innocence nor does he contend that his initial plea failed to satisfy the requirements of Rule 11. He merely asserts that his plea resulted from "lost confidence in [him]self because of [his] background", and since his codefendants had already pled guilty, he felt pressure to "do as the others had done".

476

While we can discern no prejudice to the government that would result if defendant were permitted to withdraw his plea, and while as a general proposition we would expect that a district judge would look more favorably on such a motion than where some prejudice has accrued, *see id.* at 1083 (prejudice to the government may be considered by the court in the exercise of its discretion even where defendant has not shown sufficient grounds for permitting withdrawal of his plea), we nevertheless find no abuse of discretion in Judge Ward's denial of Figueroa's motion to withdraw his plea, because "[t]he government is not required to show prejudice when a defendant has shown no sufficient grounds for withdrawal of a guilty plea * * *." *Id.*

CONCLUSION

The judgments of conviction are affirmed.