UNITED STATES of America

v.

**Ramon DIAZ, Defendant.**

**No. 91 Cr. 43 (SWK).**

United States District Court, S.D. New York.

July 3, 1991.

As Amended Oct. 3, 1991.

Otto G. Obermaier, U.S. Atty. by Stephen Fishbein, Asst. U.S. Atty., New York City, for the U.S.

Robert M. Simels, New York City, for defendant Ramon Diaz.

## MEMORANDUM OPINION AND ORDER

KRAM, District Judge.

Defendant in this criminal case has renewed his application to withdraw his guilty plea.

### BACKGROUND

Defendant Ramon Diaz, along with his codefendant Carlos Selman, arranged to purchase several kilograms of cocaine from an informant working for the Drug Enforcement Administration ("DEA"). At the time the deal was to occur, Diaz displayed approximately $40,000 in cash to the informant. The DEA agents then identified themselves and approached Diaz and Selman to arrest them. Diaz was arrested and was charged with conspiracy to possess with intent to distribute approximately two kilograms of cocaine and with assault upon a federal officer.[1]

On the day that trial was to commence, April 16, 1990, shortly after his codefendant pled guilty to the cocaine conspiracy count, Diaz also entered a plea of guilty to that same count. During the course of his plea allocution, Diaz was advised of his constitutional rights (Transcript of April 16, 1990 afternoon proceedings (hereinafter

---

1. Diaz is alleged to have fought with the agents, injuring one of them.

"Plea Tr."), 3–5); he was told that his case was governed by the Sentencing Guidelines and that the Court retained the discretion to impose a sentence anywhere within the statutory range (Plea Tr. 5); he was advised of the minimum ten-year sentence that would be imposed (Plea Tr. 7); and he provided the Court with a statement in his own words setting forth the factual basis for this plea of guilty. (Plea Tr. 10). With respect to Diaz's attorney at the time, David Segal, the following colloquy took place between Diaz and the Court:

THE COURT: You are represented by Mr. Segal?

Defendant DIAZ: (Through Spanish Interpreter) Yes.

Q. You have discussed this indictment with him?

A. Yes.

Q. You have discussed with him the particular count to which you are pleading guilty?

A. Yes.

Q. Are you satisfied with Mr. Segal's representation of you?

A. (In English) Yes.

* * * * * *

Plea Tr. 3. With respect to the knowing and voluntary character of his plea, Diaz was examined by the Court as follows:

THE COURT: How old are you, Mr. Diaz?

Defendant DIAZ: 30.

Q. How many grades did you complete in school?

A. (In English) Eleven.

Q. With the help of the interpreter, do you understand what is happening here today?

A. (In English) Yes.

Q. Have you taken any drugs, medicine, pills, or had any alcoholic beverages in the past 24 hours?

A. (In English) No.

* * * * * *

Plea Tr. 2. The Court further inquired of Mr. Diaz:

Q. You have received a copy of this indictment?

A. (In English) Yes.

Q. You have discussed that indictment with your attorney?

A. (In English) Yes.

* * * * * *

Q. I want you to understand that count one, the count to which you are pleading guilty, carries a sentence of ten years minimum to life because of a prior felony information filed, a $4 million maximum fine, supervised release period of eight years minimum to life maximum, $50 special assessment.

Do you understand that?

A. Yes.

* * * * * *

Q. Has anyone threatened you or forced you in any way to plead guilty?

A. No.

Plea Tr. 7–8. The Court found Diaz competent to plead and accepted his guilty plea. Id. at 11.

Several months later, Diaz discharged Segal as his counsel and retained Charles Theofan, Esq. Theofan approached the United States Attorney's Office with Diaz's offer of cooperation. At a meeting between Diaz, DEA Special Agent Roger Bach and an Assistant United States Attorney, Diaz signed a proffer agreement (the "Agreement," dated July 25, 1990, attached as Exhibit A to Government Memorandum of Law in Opposition). The Agreement provided that statements made by Diaz in the course of meetings with the Government for the purpose of obtaining leads to other evidence would not be used by the Government in its case-in-chief in connection with any prosecution or sentencing of Diaz, except in a prosecution for false statements, obstruction of justice or perjury. ¶¶ 1–2. During the course of the ensuing proffer session, Diaz admitted to extensive prior involvement in cocaine trafficking, including having trafficked in approximately 20–30 kilograms of cocaine per week for the past three years. Affidavit of Special Agent Roger Bach, attached as Exhibit B to Government Memorandum of Law in Opposition, at ¶ 4. However, Diaz was unable to provide specific information identifying other persons involved in drug

trafficking, insisting that he would have to be let out of jail in order to "make cases against other dealers." *Id.* ¶ 5. The government concluded that it would not enter into a cooperation agreement with Diaz.

On the date that sentencing was to occur, in November of 1990, Diaz presented to the Court *ex parte* a handwritten letter indicating that he wished to withdraw his guilty plea. The thrust of his letter was that he believed that he had merely brought together two informants for $200.00, and that he did not think he should be facing 10 years to life for doing so. Letter from Ramon Diaz to the Court [undated] (hereinafter "Diaz Letter"), attached as Exhibit "C" to Government Memorandum of Law in Opposition. He also expressed his intention to replace Mr. Theofan with a third attorney.

Through Mr. Theofan, Diaz submitted a motion to withdraw his guilty plea, based on his sworn statement that he was the victim of entrapment. Affidavit of Ramon Diaz, dated January 24, 1991, ¶¶ 3–7. He also alleged that his defense was compromised by the fact that his first attorney, David Segal, had also represented one Juan Beltre in an unrelated state court matter.[2] Diaz believed Beltre to be an informant. *Id.* ¶ 8. Diaz explained: "I wanted very much to go to trial but Mr. Segal discouraged me." *Id.* ¶ 9. Upon consideration, the Court denied the motion. *See* Order of February 6, 1991.

Diaz then replaced Theofan with a third attorney, Robert Simels. In the present motion brought on by his new counsel, Diaz now focuses on the alleged dual representation engaged in by the first attorney, whereby Segal counseled Diaz to plead guilty and not to go to trial. *Id.* ¶ 10. Diaz also alleges that Segal "initially discouraged" him from cooperating with the government, *id.* ¶ 11, presumably in order to protect his other client, Beltre, from Diaz's incriminating information.

On May 29, 1991 the Court conducted a hearing and heard testimony from Mr. Segal, called as an adverse defense witness, and from defendant Diaz.

## DISCUSSION

■ Under Fed.R.Crim.P. 32(d), "the court may permit withdrawal of the plea [of guilty] upon a showing by the defendant of any fair and just reason." The burden is on the defendant to show valid grounds for withdrawal, taking into account any prejudice to the government. *United States v. Quinones,* 906 F.2d 924, 928 (2d Cir.1990); *see United States v. Marquez,* 909 F.2d 738, 740 (2d Cir.1990); *United States v. Figueroa,* 757 F.2d 466, 475 (2d Cir.1985). There is no absolute right to a withdrawal; rather the defendant has the burden of showing that valid and adequate grounds exist for the granting of this privilege. *U.S. v. Burnett,* 671 F.2d 709, 712 (2d Cir.1982); *U.S. v. Saft,* 558 F.2d 1073, 1083 (2d Cir.1977). The motion is addressed to the broad discretion of the trial court. *Saft,* 558 F.2d at 1082.

■ When the motion to withdraw a guilty plea is based on defendant's claim that he received ineffective assistance of counsel, he must (1) overcome a strong presumption that his counsel's conduct was reasonable and show that his counsel's representation fell below "an objective standard of reasonableness" under "prevailing professional norms"; and (2) "affirmatively prove prejudice," that is, show that "but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland v. Washington,* 466 U.S. 668, 687–88, 693–94, 104 S.Ct. 2052, 2064–65, 2067–68, 80 L.Ed.2d 674 (1984); *see Hill v. Lockhart,* 474 U.S. 52, 106 S.Ct. 366, 370, 88 L.Ed.2d 203 (1985); *see also United States v. Aguirre,* 912 F.2d 555, 560 (2d Cir.1990); *United States v. Reiter,* 897 F.2d 639, 644–45 (2d Cir.1990); *United States v. Bari,* 750 F.2d 1169, 1182 (2d Cir.1984), *cert. denied,* 472 U.S. 1019, 105 S.Ct. 3482, 87 L.Ed.2d 617 (1985).

2. Beltre had been arrested with Diaz in the subject arrest but was released from DEA headquarters without being charged. He has since fled the jurisdiction in connection with an unrelated matter.

844

In cases of alleged conflict of interest, as here, the Second Circuit has stated that a defendant who wishes to withdraw his guilty plea must prove that " 'his counsel actively represented conflicting interests' and that 'an actual conflict of interest adversely affected his lawyer's performance.' " *United States v. Contractor*, 926 F.2d 128, 134 (2d Cir.1991) (quoting *Cuyler v. Sullivan*, 446 U.S. 335, 350, 100 S.Ct. 1708, 1719, 64 L.Ed.2d 333 (1980)). The Court continued: "the defendant must identify an actual conflict of interest. Allegations of wrongdoing alone cannot rise to the level of an actual conflict unless the charges have some foundation." *Id.* (quoting *United States v. Jones*, 900 F.2d 512, 519 (2d Cir.) (citations omitted), *cert. denied*, ⸺ U.S. ⸺, 111 S.Ct. 131, 112 L.Ed.2d 99 (1990)).

### 1. Dual Representation

Defense counsel has an ethical obligation to avoid dual representation or, if the dual representation is justified, to notify the clients with differing interests of the dual representation, give them the opportunity to evaluate the need for representation free of any potential conflict, and to obtain other counsel if they so desire. ABA Code of Professional Responsibility EC 5–15, 5–16 (1976). The attorney must fully explain the implications of the dual representation and obtain consent of both clients. EC 5–16.

Attorney Segal has known Diaz and his family since 1976 or 1977, and has represented Diaz since the early 1980s. Transcript of May 29, 1991 Hearing (hereinafter "Hearing Tr.") 37–41. Segal testified that he was unaware of his other client's possible involvement in the instant offense until Diaz himself raised it in March of 1990. He testified that when Diaz was first arrested in January, 1990, Diaz told him that there were a "number of people in the apartment besides himself," and that two of them had been released from DEA headquarters; but Diaz had not identified either of those individuals to him by name at the time of their initial meeting on January 16, 1990. *Id.* at 9. Segal testified that he only became aware that his client Beltre was one of the two individuals who had been released when Diaz told him so, in "late February or sometime in March" of 1990. *Id.* 6, 12. Segal indicated that Diaz was apparently already aware that Beltre was also his client, that Segal confirmed the same with Diaz (*id.* 23, 28, 47), and that they discussed it on several occasions thereafter. *Id.*

Segal testified that Diaz never implicated Beltre to him as a participant of the drug deal that took place in the apartment on the day of the arrest. *Id.* 64. According to Segal, Diaz never indicated to Segal during their association that Diaz "had a problem" with Segal's representation of both Diaz and Beltre. *Id.* 48. Segal further testified that when Diaz told him of Beltre's involvement in the instant offense, Diaz insisted to Segal that Beltre was a government informant. *Id.* 9, 24–25, 47–48. Segal told Diaz that this was not the case. *Id.* According to Segal, he counseled Diaz against using an entrapment defense at trial because he was familiar with Diaz's prior narcotics history and with his demeanor, and was concerned that these factors would make it impossible to persuade a jury of such a defense. *Id.* 57.

In the affidavit accompanying the motion, Diaz alleges that Segal's dual representation was brought to Diaz's attention in approximately in March of 1990, about a month before he pled guilty.[3] *Id.* ¶ 5–10. Contrary to Segal's testimony, Diaz suggested at hearing, although it was not entirely clear, that as early as the day after he was arrested, on January 16, 1990, that he had told Segal that Beltre was among several people present in the apartment where the drug deal allegedly took place. Hearing Tr. 79. He later testified that he had told Segal that Beltre was the owner of the money involved in the transaction "always, from the first day of the arrest I told him." *Id.* at 96. Diaz also contradicted Segal's testimony by stating that Segal

---

**3.** He modified that statement somewhat on the witness stand, indicating that he "found out for sure" only after he pled guilty. Hearing Tr. at 98–99.

never told him that he represented Beltre. *Id.* 93. Diaz also testified that Segal told him that "they had tapes" (*id.* 83), *i.e.*, that Segal had misrepresented to Diaz that the government possessed undercover tape recordings which would scuttle an entrapment defense, in order to dissuade him from going to trial and implicating Beltre.[4]

The Court finds that Segal is a credible witness and that Diaz is not. While testifying, Segal's demeanor was appropriate to the situation; his testimony was internally consistent and for the most part complete. Diaz, on the other hand, impressed the Court as being disingenuous. Many of his answers were non-responsive to counsels' questions (*see e.g.*, Hearing Tr. 78, 79), and he ignored directives of the Court. *Id.* at 89. When confronted with his own words during the plea allocution, wherein he had sworn under oath that he was satisfied with Segal's representation of him, he sprayed accusations of coercion not only against Segal but also, for the first time, against the prosecutor:

> The GOVERNMENT: Do you remember that the judge asked you, 'Mr. Diaz, has anyone made any promise, other than the agreement that was just described to me, to induce you to plead guilty,' and you said 'no'?
>
> Mr. DIAZ: You know that that day I had to do what you manipulated Segal to do with me.

Hearing Tr. 96–98; *see also id.* 107.

The Court disbelieves Diaz's account of the events entirely. The Court finds that Segal did not know that Beltre was at the apartment on the night of Diaz' arrest until some months afterwards; that he discussed the same with Diaz on several occasions thereafter, with no statement from Diaz that he objected to Segal's representation of them both; and that Segal had reasonably surmised, from Beltre's immediate release from DEA headquarters and Segal's belief that Beltre was not an informant, that Beltre must not have been involved in the offense conduct alleged in this indictment. While the Court does not specifically approve of Segal's handling of the situation, there is insufficient evidence on the record for Diaz to overcome the strong presumption that Segal's representation was objectively reasonable. *Strickland,* 466 U.S. at 687–88, 104 S.Ct. at 2064–65. Diaz has not carried his burden of proving that Segal "actively represent[ed] conflicting interests" to the detriment of his client, *Contractor,* 926 F.2d at 134, and accordingly his renewed motion to withdraw his plea must be denied.

### 2. Inadequate Trial Preparation

■ Diaz's related but distinct allegation is that Segal inadequately prepared for trial. Diaz asks the Court to infer from Segal's alleged unpreparedness that Segal intended all along to force Diaz to plead, and that he never intended to take Diaz to trial. Hearing Tr. 77.

Segal testified, and Diaz does not dispute, that prior to the trial date Segal interviewed a woman named "Norris," who was alleged to have been at the apartment on the night of the arrest. *Id.* 12, 18, 30–31, 50–51. Segal was unable to recall the woman's name (*id.* 18) but did remember that the evidence she was able to provide only served to implicate Diaz. *Id.* 12, 51. At Diaz's family's request, Segal reinterviewed Norris, with the same result as the first time. *Id.* 51, 67–68. He did not interview any of the other persons alleged to have been at the apartment that night. *Id.* 30–31, 53, 65–66.

The Court will not permit Diaz to withdraw his plea on the basis of inadequate trial preparation. Segal's failure to interview these individuals could be explained by the fact that the one witness to whom Diaz particularly directed his attention, and thus presumably the most helpful one available, implicated Diaz in the offense.[5] The Court passes no judgment on the wisdom of Segal's method of trial preparation, except to say that it was not unrea-

---

4. Segal specifically denied telling Diaz that there were any such tapes. *Id.* 15–16.

5. Segal testified that Diaz never suggested to him that Beltre might be a favorable witness. Hearing Tr. 52.

sonable under the circumstances. *See Strickland,* 104 S.Ct. at 2064. Even if inadequately explained, Segal's failure to conduct particular pretrial investigations is an insufficient basis upon which to allow the withdrawal of a plea unless defendant can demonstrate that counsel was "not fully informed of the facts of the case to provide sufficient basis to create a strategy and advise the client." *United States v. Jackson,* 89 Cr. 067 (SWK) (S.D.N.Y. June 20, 1990), Slip Op. at 7 (available at 1990 WL 88886) (citing *U.S. v. Messer,* 647 F.Supp. 704, 708 (D.C.Mont.1986)). Diaz supplies no evidence to that effect. Under the circumstances, Diaz's allegations of Segal's inadequate trial preparation cannot overcome the strong presumption that Segal's representation of him was objectively reasonable under prevailing professional norms. *See Strickland,* 466 U.S. at 687–88, 693–94, 104 S.Ct. at 2064-65, 2067-68.

### 3. Adverse Effect

■ Even if Diaz were able to show ineffective assistance by reason of undisclosed dual representation and/or inadequate trial preparation, he would be unable to demonstrate any adverse effect upon himself. Diaz asserts variously that, but for Segal's advice to plead guilty and not to cooperate, Diaz would have either proceeded to trial on an entrapment defense or sought a cooperation agreement with the Government. Diaz Aff. 1/24/91 ¶¶ 8. However, in his most recent motion he seems to have determined that it is not in his interest to go to trial at this time because of the self-incriminating information he gave at his post-plea proffer session. Defendant's Memorandum in Support of Motion to Withdraw at 6–7. He indicates that if this motion were granted and he were to elect to go to trial and take the witness stand, he would want the Court to preclude the government from introducing any statements made in his proffer session.[6] *Id.* at 7.

6. Diaz cites no authority in support of the argument that his testimony from the proffer session should be excluded. In light of the Court's disposition of Diaz's ineffective assistance of counsel argument, *ante,* and the fact that his offer of cooperation was made under the advice

The burden is on the defendant wishing to withdraw his plea to "affirmatively prove prejudice." *Strickland,* 466 U.S. at 693, 104 S.Ct. at 2067. Nothing in the record indicates that Diaz would proceed to trial if that evidence were admitted. Accordingly, the Court has no basis for concluding that Diaz has suffered an adverse impact as a result of Segal's advice, even if that advice were found to be tainted by a conflict of interest.

As for the possibility of cooperating, Diaz did at one point seek to enter into a cooperation agreement with the Government. After meeting with Diaz and holding a proffer session, the Government declined his offer of cooperation, for the reasons that follow:

the magnitude of Diaz's prior narcotics trafficking of which the Government had been unaware, the vague and limited nature of the information he provided concerning other violators, his confrontational and conceited manner which made him unsuitable to be an informant or a witness, and the fact that as a result of his incarceration, he was not in a position to provide introductions to persons on the street he knew only by nicknames.

Government's Memorandum in Opposition, at 3; *see* Bach Affidavit ¶¶ 4–5.

It is apparent to the Court that none of these factors was even remotely related to Segal's prior representation of Diaz, nor would the outcome have been different had Diaz sought the opportunity to cooperate earlier in 1990, during Segal's tenure as his attorney. Moreover, at no time during the proffer session did Diaz mention Beltre's name. Bach Affidavit ¶ 5. Thus, Diaz can show no causal connection between Segal's dual representation and Diaz's determination to plead and not to seek a cooperation agreement.

Diaz cannot show on the facts as developed on this record that any conflict of

of other counsel, Attorney Theofan, there is no causal link between Segal's conduct and Diaz's testimony at the proffer session. Accordingly, there is no basis for excluding this testimony at trial.

interest by Segal, even if true, "adversely affected his ... performance." *Contractor*, 926 F.2d at 134. There is no valid basis under this standard for permitting Diaz to withdraw his guilty plea, and the Court will not permit him to do so.

### 4. Coercion

■ Finally, Diaz alleges that his entire plea allocution was tainted by the efforts of various persons to coerce him. At the hearing on this motion he testified that he pled guilty "due to the fact that I was being pressured too much," by Segal in conjunction with the Assistant United States Attorney. Hearing Tr. 83. Diaz testified that he had stated to Segal his intention to tell the Court at his plea allocution that the money involved in the drug transaction belonged to Beltre, but that Segal advised him that if he told that to the judge "she was going to give me more years than what he had told me." *Id.* 87. He later embellished the reported conversation: "[Segal] said to me that if I dared to sit here and say that the money belonged to Juan Beltre, he was not going to represent me". *Id.* 90.

Courts in this Circuit grant considerable deference to apparently truthful statements made by a defendant in the course of a plea allocution. *See United States v. Collado–Gomez*, 674 F.Supp. 426, 428–29 (E.D.N.Y.1987) ("Statements made during a plea are conclusive absent credible reason justifying departure from their apparent truth"), *aff'd*, 854 F.2d 1315 (2d Cir.1988). Diaz's recent claim that his plea was not voluntary is simply not substantiated by the record. At the time of his plea, Diaz had allocuted to this Court that no one had threatened or forced him in any way to plead guilty. Plea Tr. 8. As required by Rule 11 of the Federal Rules of Criminal Procedure, he was questioned as to his understanding of the charges and potential penalties, and was repeatedly advised on the nature of the constitutional rights which he was waiving. He was asked if he had any dissatisfaction with his representation, to which he answered no. The Court inquired as to any coercion, threats, promises or prophesies, which Diaz also answered in the negative. Moreover, in his affidavit accompanying this motion he conceded that he was aware of the purported dual representation problem over one month before he pled. Diaz Aff. ¶¶ 5–10. The defendant admitted to this Court that he set up a drug deal and that he knew what he did was wrong, and he apologized to the Court for having committed that crime. Plea Tr. at 10. This Court, having had the opportunity at that time to observe the defendant, found that he was competent to plead, that he knew his rights, and that his plea was a voluntary one. Plea Tr. 11. The Court then determined to accept his guilty plea. *Id.*

Although the existence of a complete allocution is not conclusive of voluntariness, it is to be granted some importance, lest the allocution procedure mandated by Rule 11 be rendered a futile waste of time. *Jackson,* slip op. at 10 (citing *Unger v. Cohen,* 718 F.Supp. 185, 190 (S.D.N.Y.1989)). Under the present circumstances, there is simply no credible evidence to support Diaz's newfound allegations of coercion. *Cf. United States v. Sanderson,* 595 F.2d 1021, 1022 (5th Cir. 1979) (accusation of coercion and withholding of material information by defense attorney merited hearing where appellant made specific factual allegations supported by the affidavit of another attorney who was present during the conversation) (cited in *Jackson,* slip op. at 7).

In contrast to the facts in *Sanderson,* Diaz presents neither a specific factual basis nor evidence other than his own *post hoc* testimony to support his allegations of coercion. The Court does not credit Diaz's account of the allegedly coercive remarks by Segal just before the plea, to the effect that Segal told Diaz that if Diaz implicated Beltre during his allocution, the Judge would give him a longer sentence and Segal would not represent him. Moreover, even if Segal did make such comments as Diaz reports, they could be interpreted in at least three different ways, two of which are entirely innocuous: (1) Segal was warning Diaz not to lie under oath because he could receive additional jail time for ob-

struction of justice or perjury; (2) Segal was informing Diaz that if it was his testimony that Beltre was involved in the transaction, that Segal had a conflict of interest and could not represent him; or, (3) more disturbingly, that Segal was threatening Diaz in order to protect Beltre. *See id.* 93. Because Diaz's account of these statements, even if credited, is so ambiguous, the Court does not consider it to be any proof of coercion and cannot accord it any weight.

■ Among all of Diaz's recent testimony in connection with his repeated motions to withdraw his plea, the Court finds most credible his untutored admission in his November, 1990 letter to the Court that he thinks ten years is too long a sentence for the crime he committed. The fact that a defendant may have a change of heart is simply not a sufficient basis to withdraw a plea made in open court. *Figueroa,* 757 F.2d at 475.

Upon considering defendant's affidavits, testimony, and other evidence in this matter as well as governing legal principles, the Court concludes that defendant Diaz has shown no "fair and just reason" for the Court to permit him to withdraw his guilty plea. Accordingly, his renewed motion for withdrawal is denied.[7]

### CONCLUSION

For the aforementioned reasons, the Court denies Diaz's second motion to withdraw his guilty plea.

SO ORDERED.

---

**7.** While the government need not show prejudice where, as here, the defendant has not proffered any "fair and just reason" for withdrawal, *Figueroa,* 757 F.2d at 476, if the Court were to reach the issue it would find that under the circumstances the government would be substantially prejudiced if it were to have to try this case now, well over a year after the original trial date. *See Jackson,* Slip Op. at 11 & n. 7.