**Wai Ho TSANG, Petitioner,**

v.

**UNITED STATES of America, Respondent.**

**No. 90 Civ. 1839 (RWS).**

United States District Court, S.D. New York.

Sept. 29, 1990.

As Amended Oct. 25, 1990.

Wai Ho Tsang, pro se.

Otto G. Obermaier, U.S. Atty. S.D. New York, New York City (Nancy E. Ryan, Sp. Asst. U.S. Atty., of counsel), for respondent.

## OPINION

SWEET, District Judge.

Petitioner Wai Ho Tsang ("Tsang") has moved pursuant to Title 28, § 2255, to vacate the sentence imposed upon him on August 1, 1986 on the grounds that his plea of guilty was entered in the absence of his understanding concerning the charges against him and the consequence of his plea. For the reasons set forth below, the motion is denied.

*Prior Proceedings*

The petition arises from Tsang's conviction by plea of guilty of violations of Title 18 U.S.C. §§ 1962(c), 371, and 1955. On December 27, 1984, Tsang was indicted with twenty-four others and charged with violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), Title 18 U.S.C. § 1962(c) and (d), and other crimes. Tsang and his co-defendants were all accused of membership in a Chinese gang called the Ghost Shadows, whose members committed, among other things, thirteen murders during the course of the indictment period.

The indictment charged that Tsang was a member of the Ghost Shadows and committed eight separate acts of racketeering. Two of them were murders—the first in 1976, of a thirty-nine year old woman who was shot as she dined out with her family and friends in the Co Luck Restaurant; and the second in 1980, of a nineteen year old boy. In addition to the murders, Tsang was charged with engaging in gambling, extortion, armed robbery, conspiracy to commit murder, and the intimidation of a witness.

Tsang was arrested on the indictment on February 17, 1985. In 1986 guilty pleas were entered by all of the defendants then apprehended, a total of twenty, including Tsang. On May 1, 1986 Tsang entered a plea of guilty Count I of the indictment, which charged him with racketeering. On the same date, as part of a plea agreement entered into with Tsang and his counsel, he signed a standard waiver of indictment and pled guilty to a two count information charging violations of 18 U.S.C. § 371 and 1951 and 18 U.S.C. § 1955.

Tsang was sentenced on August 1, 1986 to a term of twenty years imprisonment on Count I of the indictment and to a consecutive term of five years imprisonment on Count I of the information. On Count II of the information, the court placed Tsang on

probation for five years to follow the completion of his jail term.

Tsang, through counsel Roger Schwarz, made a timely motion for reduction of his sentence pursuant to Rule 35 of the Fed.R.Cr.P. On November 14, 1986, after reviewing submissions by both parties and hearing oral argument, the court granted the motion to the extent of reducing the sentence imposed on Count I of the information to three years.

On March 19, 1990, Tsang filed the instant *pro se* motion to vacate the judgment of the court pursuant to 28 U.S.C. § 2255, alleging violations of the Due Process Clause and of Fed.R.Cr.P. 11 and 7 in that the court failed to inform him (1) of the nature of the charges to which he was pleading guilty, (2) that he had an absolute right to be indicted by a grand jury; and (3) that the court lacked jurisdiction over him because he was not a "person" within the meaning of Title 18 U.S.C. § 1961(3). In support of the motion, Tsang appends an affidavit in which he swears, ". . . my sole reason for pleading guilty was a lack of any comprehension of the nature of the charges against me." The government opposed the motion, and the matter was marked fully submitted on July 30, 1990.

*Background of the Plea*

Tsang first appeared in court on February 19, 1985 when he was arraigned before Magistrate Harold Raby. A detention hearing was adjourned to February 22, 1985. Tsang was present on that date and was represented by retained counsel, Gerald McMahon. The government asked that Tsang be detained, relying on a detailed proffer. The government alleged that Tsang had been a "lieutenant" in the Ghost Shadows, with authority over a particular group of gang members who were under his personal direction and control. Each of the acts of racketeering with which Tsang was charged was described, and Tsang's own conduct in relation to those acts spelled out. The government outlined for the court the nature of the proof it would tender at trial, and enumerated details of Tsang's history—his use of false names, his unlawful purchases of firearms, his his-

tory of fugitivity, and so on—which supported the view that no condition of bail would reasonably assure his appearance as required or the safety of the community. After hearing argument from counsel and further colloquy, Magistrate Raby ordered Tsang detained.

On March 5, 1985, Tsang filed an appeal of the detention order with the court. The government responded on March 12, 1985. Subsequently, Roger Schwarz, was substituted as Tsang's retained attorney, and on April 5, 1985, he filed further papers on behalf of Tsang. The papers submitted by the government again set forth in detail the allegations against Tsang, including that he and his co-defendants were accused of being members of a criminal enterprise called the Ghost Shadows, of which Tsang was a leader. They outlined the gang's nature, history, and activities, and described the particular role and conduct attributed to Tsang. On July 26, 1985, the court upheld Magistrate Raby's detention order.

Prior to trial Tsang appeared before the court to hear argument on various pretrial motions and to discuss scheduling matters and was provided with a Bill of Particulars and discovery materials, including tape recordings and draft transcripts.

In early 1986, on the eve of trial, the defendants initiated serious plea negotiations. After extensive discussions between the Special Assistant United States Attorney and counsel for all the defendants, every one of them, including Tsang, entered pleas of guilty. Tsang was the eleventh defendant to plead before the court.

According to the SAUSA, plea negotiations between the government and Tsang's counsel were perhaps more detailed and complex than they were for any other defendant. Tsang sought to reduce his maximum exposure to thirty years. However, the two counts against him in the indictment each carried twenty year sentences, and the government could not countenance a maximum exposure of twenty years. Therefore, after lengthy consultations with counsel, Tsang entered into an agreement with the government under which he would

waive indictment and plead guilty to an information containing two five-year counts, in addition to pleading guilty to a RICO count contained in the indictment. The counts specifically agreed upon charged violations of 18 U.S.C. §§ 371 and 1951 and 18 U.S.C. § 1955. Plea negotiations with the defendant also dealt extensively with the question of what admissions he would make in connection with the various acts of racketeering with which he was charged. Counsel for Tsang repeatedly conferred with his client and then offered further refinements of his position to the government.

The results of the plea negotiations with Tsang were ultimately embodied in a "Memorandum of Agreement," dated May 1, 1986, signed by Tsang himself and incorporated into the record as part of the plea colloquy.

*The Plea*

On May 1, 1986 Tsang entered guilty pleas on Count I of Indictment S84 Cr. 1025 and on the two count information drafted pursuant to the plea agreement (86 Cr. 378). Tsang was represented by Roger Schwarz and assisted by an official court interpreter, Patsy Ong.

Tsang and his attorney both signed the standard waiver of indictment form in connection with the information. In it Tsang stated that he had been "advised of the nature of the charge and of his rights," and that he consented to be prosecuted by information rather than by indictment.

The court informed Tsang of the rights set forth in Rule 11 and advising him that, by pleading guilty, he waived those rights and that in the course of the plea the court would ask him whether he was pleading guilty freely and voluntarily and stated:

> Before accepting a guilty plea I expect that you will have discussed this case fully with your lawyer and that he has advised you of the nature of the charges, your rights, the factual basis for your plea, the consequence of your plea, and any defense that you might have.

The statutes under which Tsang was charged were enumerated and the potential consequences of his plea.

Under questioning by the court, Tsang declared that he was satisfied with his attorney and that he had read and understood both the indictment and the information which had been filed against him. He stated that he had told Mr. Schwarz everything he knew about the matters charged in the two instruments and that his attorney was fully informed. The court then asked:

> Q. Has Mr. Schwarz advised you of your rights and explained the charges to you and discussed with you any defense which you might have?
>
> A. Yes, absolutely.
>
> Q. Do you have any questions for him or me concerning the charges or the proceedings today or your rights?
>
> A. No, not at all.

The Memorandum of Agreement negotiated and signed by Tsang and the government was entered into the record. Among other things, it specifically provided that the government should bring to the court's attention "whatever information it may develop concerning the duration of Tsang's involvement in the enterprise alleged and whether he had withdrawn from or become less active within the enterprise prior to his arrest."

The court and Mr. Schwarz both put questions to Tsang to explore the factual basis for his plea. In response to those questions, Tsang admitted that he, with others, had extorted or attempted to extort property from various kinds of businesses during the indictment period. He had personally visited some establishments and told them that if the payments his group expected were not made, there might be trouble. He acknowledged having conducted part of an illegal gambling business—reaping profits from it, bringing in customers, and assisting its owners and managers—knowing that the gross revenues of the gambling establishments with which he was involved exceeded $2,000 per day. He admitted agreeing with members of his group to transport them to and from the Co Luck Restaurant to look for Flying Dragons, knowing that if Dragons were

present guns might be used against them and acknowledged that he carried the plan out. He admitted travelling with members of his group to Chicago and being present, armed, at the Chicago On Leong building on August 9, 1980, when William Chin was shot. He acknowledged that he went there with his group by prior agreement, and that he knew that people might be shot if trouble broke out.

When Mr. Schwarz had finished putting questions to Tsang, the court asked:

Q. Mr. Tsang, you described certain acts in response to your counsel's questions. Were those acts committed in furtherance of the activities of the Ghost Shadows?

A. Yes, sir.

Q. And were you a member of the Ghost Shadows?

A. Yes.

Q. At the time you committed the acts which you have described to your counsel, did you know you were violating the law?

A. Yes, I did.

In Tsang's presence Mr. Schwarz confirmed Tsang's assertion that he had advised him of his rights, the nature of the charges, and the consequences of his plea. Schwarz declared himself satisfied that Tsang was "pleading freely and voluntarily because he is guilty and for no other reason."

*The Sentence*

Tsang appeared for sentence on August 1, 1986. Prior to that date the government had served and filed a fifty page presentence memorandum which identified Tsang as a leader of the gang, and stated that he had risen to the level of "lieutenant" and had a group of "kids" under his personal control.

By letter dated June 19, 1986, Tsang's counsel alleged, among other things, that his client had become "considerably less active in the affairs of the enterprise with a view toward withdrawing entirely" beginning in late 1982 or early 1983. He further claimed that "withdrawal was not necessarily a simple matter since any abrupt change

would have aroused considerable suspicion on the street" and might even have provoked violence.

Tsang submitted an additional "Supplemental Pre–Sentence Memorandum," dated July 22, 1986. He offered detailed, specific denials of some of the government's factual allegations. Among other things, he disputed the government's assertion that he had been "actively" involved with the Ghost Shadows for roughly seven years, claiming that he was outside the Southern District during substantial portions of the indictment period. But Tsang did not deny having been involved with the Ghost Shadows enterprise at all. On the contrary, he averred:

Tsang's involvement waxed and waned during a total period of no more than six years. If all the time that he was physically disassociated from the enterprise is considered, it is clear that his total involvement was probably closer to three to four years.

Tsang's sentencing took place on August 1, 1986. His counsel began by stating that:

I have in the past and again last night at the MCC advised my client that he has both the statutory and constitutional right to controvert certain things that have been said ... to the court ...

However, Tsang had decided not to press the specific denials he had detailed in his written submission to the court.

Tsang's counsel did devote considerable time to making a plea on his client's behalf. In the course of that plea he repeated the contention he had previously advanced in writing that Tsang's involvement with the Ghost Shadows had diminished over the course of time. At no time did he claim that he had never been involved with the gang; on the contrary, he sought to explain his involvement in what he acknowledged was a form of organized crime by addressing the role of the "Chinese underworld"—the Tongs—in the seduction of vulnerable teenagers.

Tsang declined an opportunity to address the court on his own behalf.

Tsang was sentenced to a term of twenty years imprisonment on Count I of the in-

dictment and to a consecutive term of five years on Count I of the information. On Count II of the information, the court placed defendant on probation for five years to follow the completion of his jail term.

On his Rule 35 motion, counsel noted: During preparation for trial, counsel met with Tsang on numerous occasions, initially, to make certain that Tsang understood the complex charges and their respective penalties and later, to explore possible defenses and to review the voluminous discovery material.

Oral argument on the motion was heard on November 14, 1986. Counsel argued at some length for greater leniency and stated, "Mr. Tsang certainly has always known and understood how grave the underlying offenses were and he would never want me to argue otherwise." The government's response dealt in part with the nature of Tsang's crimes as enterprise crimes.

In view of the thirty year maximum to which Tsang's plea had exposed him, the court believed that it had not given him sufficient "credit" for his plea in comparison to other defendants in the case. Accordingly, the sentence on Count I of the information was reduced from five years to three years.

*Grounds for Collateral Attack Have Not Been Established*

█ The controlling legal principles are well settled. A defendant may not collaterally attack a guilty plea taken under Rule 11 of the *Federal Rules* where "all that is shown is a failure to comply with the formal requirements of the Rule." *United States v. Timmreck,* 441 U.S. 780, 785, 99 S.Ct. 2085, 2088, 60 L.Ed.2d 634 (1979). To obtain collateral relief a defendant must demonstrate that his plea was infected with a fundamental error "which inherently result[ed] in a complete miscarriage of justice or an omission inconsistent with the rudimentary demands of fair procedure." *Hill v. United States,* 368 U.S. 424, 82 S.Ct. 468, 7 L.Ed.2d 417 (1962), quoted in *United States v. Timmreck, supra,* 441 U.S. at 783, 99 S.Ct. at 2087. Moreover, it is the technical requirements of Rule 11, "not due

process, that require federal courts to conduct a factual inquiry before accepting a guilty plea." *Willbright v. Smith,* 745 F.2d 779, 780 (2d Cir.1984). The Constitution requires only that the plea be voluntary and intelligent.

█ Furthermore, where, as here, the fairness of the entire procedure is at issue, a court is not limited to the plea allocution itself, but may consider the entire record in order to determine whether a miscarriage of justice has occurred. *Bachner v. United States,* 517 F.2d 589, 598 (7th Cir.1975) (Stevens, J., concurring). *Accord Alessi v. United States,* 593 F.2d 476, 481 & n. 6 (2d Cir.1979), *cert. denied,* 451 U.S. 937, 101 S.Ct. 2015, 68 L.Ed.2d 323 (1981).

█ Tsang does not contend that he is the victim of a "miscarriage of justice" and does not claim that he is actually innocent of the racketeering, extortion, or gambling charges to which he pled guilty. The government's entire case against Tsang and his co-defendants, and the record as a whole, amply demonstrate that Tsang was guilty as charged.

As to his understanding, in his plea colloquy Tsang stated under oath, with an interpreter, that he had discussed the charges fully with his attorney, that he understood them, and that he was satisfied with his representation. His attorney confirmed that.

The record as a whole leaves no doubt that the statements Tsang made to that effect were true. By the time Tsang entered a plea the case against him had been pending for over fourteen months, during the course of which he had been represented by an able and experienced attorney, chosen by him and his family. He had first heard the charges against him explained as early as February 19, 1985, during the detention hearing held before Magistrate Harold Raby. His counsel subsequently filed an appeal from the magistrate's decision to detain him. He was in court on a number of occasions for arguments on motions. He had received voluminous discovery from the government, including tapes and draft transcripts of their contents. He was in

daily contact with co-defendants who were all considering the plea package offered by the government. Through counsel, he had negotiated his own detailed and specific written plea agreement, which included precisely crafted admissions to portions of selected predicates. He made a choice to break with most of his co-defendants by admitting more than they did while decreasing his sentencing exposure. He did not plead guilty until the very eve of trial, and by the time he did nearly a dozen of his co-defendants had gone before him.

Tsang's sentence did not take place until after he and the government had both made extensive submissions to the court. Tsang plainly understood the government's views, down to its most specific factual allegations; for his own written submission dealt with selected, specific details of the government's contentions. Indeed, Tsang's sentencing submission, like his plea agreement and his allocution, revealed that he had worked with his attorney in an effort to pick apart the government's case, honing in on specific predicates and elements of the crimes charged in a manner that shows full comprehension of their nature. Yet Tsang did not complain of any lack of understanding even at the time sentence was imposed, after he had received the government's lengthy memoranda and when he once again heard the government's contentions set forth on the record. Likewise, though he made a Rule 35 motion, he never hinted that he had not understood the charges against him.

Tsang's more specific complaints about his plea colloquy—e.g., that no one apprised him that he had to have conducted or participated in the affairs of an enterprise, that no one explained that the affairs of the enterprise had to affect interstate commerce, that no one told him that his participation had to be through a pattern of racketeering activity, and that no one informed him that he was pleading guilty to "financing," "managing," "supervising," "conducting," or "owning" all or part of a large scale gambling business—provide no basis for setting aside his conviction under 28 U.S.C. § 2255.

■ The contention that Tsang failed to grasp the enterprise element of RICO is refuted by the descriptions of the Ghost Shadows—their methods of functioning, their power, their impact, and their purposes—which permeated the proceedings at every stage, from the earliest bail arguments to the post-judgment proceedings. Tsang sought to downplay his tenure and role in the gang, but he certainly did not dispute his membership; and the efforts he made to minimize his involvement are themselves proof that he grasped full well the enterprise element of the charges against him.

The court was not required "to deliver to the defendant the equivalent of a jury charge," *United States v. Saft*, 558 F.2d 1073, 1078–79 (2d Cir.1977).

■ Tsang makes the further claim that the court's alleged failure to inform the defendant of his right to be indicted by a grand jury in pleading guilty to an information requires that his plea be set aside. In support of his claim, Tsang relies on Rule 7 of the Federal Rules of Criminal Procedure. Rule 7(b) states:

(b) Waiver of Indictment. An offense which may be punished by imprisonment for a term exceeding one year at hard labor may be prosecuted by information if the defendant, after he has been advised of the nature of the charge and of his rights, waives in open court prosecution by indictment.

The waiver of indictment and the terms of the information were fully bargained for, as is evidenced by the Memorandum of Agreement entered into the record on the date of Tsang's plea. Tsang executed the standard Waiver of Information form at the time of his allocution, stating that he "... waives in open court prosecution by indictment and consents to proceedings by information instead of by indictment." There was full compliance with the mandate of Rule 7(b).

■ Tsang makes the further claim that he does not fall within the ambit of the RICO statute because he is not a "person" as defined by 18 U.S.C. § 1961(3). That section defines a "person" to include "any

individual or entity capable of holding a legal or beneficial interest in property." Tsang argues that the definition restricts the reach of the statute to those twenty-one years of age or older, and claims that, under that definition, he was not a "person" at the time Acts of Racketeering Eleven through Thirteen were committed. Tsang's argument is imaginative but without merit.

Even if Tsang's reading of the statutory definition were correct, his guilty plea would stand. Tsang's birth date is September 12, 1956. He turned twenty-one on September 12, 1977. The indictment period extends to November of 1982. Thus, Tsang was accused of participating in a racketeering enterprise until more than five years after his twenty-first birthday. The gambling and extortion predicates he allocuted to also extend through November 1982, and Tsang was twenty-three years old when he participated in the murder of William Chin. His guilt was firmly established by his plea regardless of the merits of his definitional argument.

In addition, the legislative history indicates that the statutory definition contained in § 1961(3) was intended to be broad. U.S.Code Congressional and Administrative News, 91st Congress Second Session (1970), Vol. 2, p. 4032. It is, therefore, sensible to read the RICO statute as applying to "any individual," and to read the phrase "capable of holding a legal or beneficial interest in property" as applying only to the word "entity."

Tsang's claims fall far short of the showing necessary to vacate a conviction under 28 U.S.C. § 2255. He understood the charges against him at the time of his plea and was properly within the jurisdiction of the court.

IT IS SO ORDERED.