**UNITED STATES of America, Appellee,**

v.

**Howard E. SAFT, Defendant-Appellant.**

**No. 1271, Docket 77–1143.**

United States Court of Appeals,
Second Circuit.

Argued June 10, 1977.

Decided July 5, 1977.

Angelo T. Cometa, New York City (Sheila Ginsberg, David Richenthal, Jonathon Warner and Phillips, Nizer, Benjamin, Krim & Ballon, New York City, of counsel), for defendant-appellant.

Steven A. Schatten, Asst. U. S. Atty., New York City (Robert B. Fiske, Jr., U. S. Atty. and Audrey Strauss, Asst. U. S. Atty., New York City, of counsel), for appellee.

Before FRIENDLY, TIMBERS and MESKILL, Circuit Judges.

FRIENDLY, Circuit Judge:

This appeal concerns the propriety of a ruling by Judge Pierce, in the District Court for the Southern District of New York, refusing to allow appellant, Howard E. Saft, to withdraw his plea of guilty and entering a judgment of conviction upon it. We affirm.

Appellant is an experienced businessman, born in 1923. He was president and chief executive officer of Adlay Jewelry, Inc. (Adlay) and owned 75% of its stock. Adlay's business consisted principally of retail sales of jewelry at concessions in department store chains located in the metropolitan New York area and in other parts of the country.

On April 21, 1976, Saft, along with Norman Fialkow and Edward Weizer, respectively a member and an employee of Adlay's accounting firm, Chaikin & Fialkow, were indicted by a grand jury in the Southern District of New York. The indictment contained 23 counts. Count One charged all three defendants with conspiring, along with deceased co-conspirator Leon Chaikin, to file false financial statements for Adlay and its subsidiaries for the years 1971 through 1973 with banks and other lending institutions, causing them to loan over $5 million to Adlay and its subsidiaries, in violation of 18 U.S.C. § 371. Counts Two through Eight charged Saft and his two co-defendants with having filed false financial statements with four New York banks in connection with bank loans and other extensions of credit, in violation of 18 U.S.C. §§ 1014 and 2. Counts 9 through 21 charged Saft and his co-defendants with mail fraud, in violation of 18 U.S.C. §§ 1341 and 2. Count 22 charged Saft with income tax evasion with respect to an excess of $100,000 in unreported taxable income for the 1973 calendar year. Finally, Count 23 charged co-defendant Fialkow with perjury before the grand jury in violation of 18 U.S.C. § 1623.

The conspiracy count of the indictment outlined the nature of the scheme to violate §§ 1014 and 1341. Paragraph 11 of that count stated:

The objects of the conspiracy were (i) to prepare and distribute and to allow and to cause the preparation and distribution of financial statements of Adlay and its subsidiaries which were false and misleading; (ii) to conceal the true state of affairs at Alay and its subsidiaries, including the amounts actually owed creditors, and the fact that Saft was secretly taking out of Adlay and its subsidiaries hundreds of thousands of dollars for his own use and for his own purposes; (iii) to submit false and misleading financial statements for Adlay and its subsidiaries and other false and misleading information to various banks, other lending institutions and creditors; and (iv) to thereby fraudulently cause the unsuspecting banks, other lending institutions and creditors to loan or otherwise advance over $5 million to Adlay and its subsidiaries.

Paragraph 12 detailed the means by which the conspiracy was carried out, alleging in part that the defendants and their co-conspirators knowingly prepared financial statements for Adlay that falsely stated

that inventories had been taken under the supervision of Chaikin & Fialkow; that incorrectly valued inventories; that understated certain liabilities and overstated certain asset accounts; and that understated amounts owing from Saft. The conspiracy count went on to charge that as a result of the false financial statements, four banks— Bank Leumi Trust Company of New York, Empire National Bank, National Bank of North America and American Bank & Trust Company—had made loans to Adlay aggregating approximately $4,755,000. As indicated, the substantive counts Two through Eight charged the defendants with making various false financial statements "for the purpose of influencing the action" of the banks with respect to making loans to Adlay or changing their terms. It appears from the Government's sentencing memorandum in the district court that Adlay went into bankruptcy in June 1974 and the banks lost over 80% of their loans.

Count 22 of the indictment, headed "Income Tax Evasion", charged:

On or about the 15th day of April 1974, in the Southern District of New York, Howard E. Saft, the defendant, who during the calendar year 1973 was married, unlawfully, wilfully and knowingly did attempt to evade and defeat a large part of the income tax due and owing by him and his wife to the United States of America for the calendar year 1973, by preparing and causing to be prepared, by signing and causing to be signed, and by filing and causing to be filed with the Internal Revenue Service, an income tax return on behalf of himself and his wife, wherein it was stated that he and his wife had $33,810.23 taxable income for the year 1973 and that the amount of income tax due and owing thereon was $9,626.30, which return was false and fraudulent, as he then and there well knew, in that their taxable income for the year 1973 was in excess of $140,000, and that for year 1973 there was due and owing to the United States thereon an income tax of in excess of $90,000.

The Government contended that the undeclared income consisted of moneys which Saft had siphoned out of Adlay.

Saft, represented by retained counsel, had originally pleaded not guilty on April 29, 1976. On May 5, at his request, Saft was assigned counsel, David L. Fox, Esq.; subsequently an accountant was appointed to render financial assistance for Saft's defense at public expense.

After plea negotiations between his counsel and the prosecutor, Saft sought leave on September 28, 1976, a few days before trial was set to commence, to withdraw his not guilty plea and to plead guilty to two of the false statement counts, Three and Six,[1] and the tax evasion count, 22, with the remaining counts to be dismissed on sentence. Judge Pierce thereupon conducted a meticulous examination of Saft.

At the outset, after hearing defense counsel's application for entry of the guilty plea, the district court elicited from Saft that he was 53 years old, that he was the founder of Adlay, and that he held a Bachelor of Science degree from Columbia University. During this inquiry the court also determined that Saft had received a copy of the indictment and had read it. Nevertheless, the district court instructed the clerk to read aloud the pertinent counts. The clerk did so and asked whether the defendant understood the charge read to him and how he wished to plead. Saft replied that he understood each charge and pleaded guilty to each.

Judge Pierce then inquired himself whether Saft "fully" understood the charges against him. Saft said "I do, Your Honor". After determining that the defendant had gone over the indictment with his attorney, that his attorney had explained the charges to him, that he told his attorney everything that he knew about the case and had held nothing back, Judge Pierce proceeded to ascertain that Saft un-

---

1. These concerned loans of $1,200,000 by the Empire National Bank and $1,000,000 by the National Bank of North America.

derstood that he was waiving a long list of rights in choosing to plead guilty, specifically mentioning the following:

(1) "that if you did not plead guilty to these charges you would have a right to a speedy and public trial by a jury of twelve people";

(2) "that upon such a trial you would be presumed innocent unless and until the government established your guilt beyond a reasonable doubt to the satisfaction of all 12 jurors";

(3) "that upon such a trial you would have the right to confront and cross examine all witnesses called by the government against you";

(4) "that upon such a trial you could remain silent and no inference could be drawn against you by reason of your silence or if you wanted to you could take the stand and testify in your own defense";

(5) "[that] if you wanted to you could have a trial before a Judge without a jury in which the burden would be on the government and you would have the same constitutional rights";

(6) "that you would have the right of a trial to subpoena witnesses and evidence to your own defense"; and

(7) "[that] if your offer to plead guilty to these charges is accepted, you give up these rights with respect to the charges against you and the Court can impose sentence upon you just as if a jury had brought in a verdict of guilty on each of these charges against you". Saft responded in the affirmative each time the Judge asked if he understood these various rights and consequences of a guilty plea.

The district court then stated the maximum sentence on each count and also aggregated the maximum penalties on all three counts, asking if Saft understood these possible punishments. Saft said that he understood. In inquiring about any promises, the court determined that the only agreement was for dismissal of open counts at time of sentence. The court next asked the defendant if his guilty plea was induced "by reason of any promise, state-ments or predictions by anybody in the event you will get leniency or consideration by pleading guilty instead of going to trial". Saft said "No." Similarly, Saft denied that he had "been induced to plead guilty by reason of any fear or threats or force or the like".

Before proceeding further, Judge Pierce gave Saft an opportunity "to ask the Court about these charges or the consequences of pleading guilty at this time". Saft had no questions. The court then inquired if Saft was pleading guilty "because you believe you are guilty of these charges". Saft said "Yes, Sir."

After ascertaining that the Government represented that it not only had a prima facie case but believed it could prove the charges beyond any reasonable doubt; that there was no legal defense of which defense counsel was aware if he went to trial; and that Saft still wished to plead guilty, Judge Pierce proceeded to elicit the factual basis for the plea.

In a colloquy that covers nine pages of transcript, Saft acknowledged that he knew that Adlay's 1972 financial statements falsely stated that Chaikin & Fialkow had supervised the taking of physical inventory. In addition, Saft admitted that the financial statements were false and misleading in that Saft was deriving monies from Adlay in excess of the salary and borrowings shown on those statements. Saft also acknowledged that the false financial statements were submitted to the Empire National Bank (count 3) and National Bank of North America (count 6) to obtain two million dollars in loans for Adlay, that this was done "to influence the action of" the banks, and that he "knew it was against the law to do what [he was] doing in each instance".

As to the tax evasion count (count 22), Saft admitted that he and his wife filed a joint income tax return for the 1973 calendar year which reported Saft's taxable income as approximately $34,000 for that year and which reported the tax due and owing as $9,626.20. Saft further admitted that his taxable income for 1973 was at

least $75,000 on which he owed $10,000 to $20,000 more in taxes than his tax return indicated. Saft also acknowledged that his "purpose" in filing the false return was "an attempt on [his] part to evade or defeat the tax fully due", that he intended to do what he did,˙ and that he knew that it was a violation of the law to do what he did at the time.

The district court found the guilty pleas acceptable, directed their entry and set the case for sentencing on November 9, 1976.[2]

On November 3, 1976, six days before the date scheduled for sentencing, the district court was informed that Saft had retained new counsel who would move to withdraw the guilty plea. An adjournment of sentencing was granted and dates were set for submission of papers. On November 24, 1976, the motion was filed. The only asserted ground for the motion was Saft's claim that the plea was involuntary and entered at the behest of his prior attorney. No mention was made in the initial papers of any failure to comply with Rule 11 of the Federal Rules of Criminal Procedure or with *United States v. Journet,* 544 F.2d 633 (2 Cir.), decided November 1, 1976. By order of January 24, 1977, Judge Pierce noted defense counsel's intent to rely also on *Journet* and set dates for filing supple-

mental papers. In such papers, filed on January 31, 1977, Saft added the claim that Rule 11 had been violated and that *Journet* required that the plea be vacated.

On February 18, 1977, Judge Pierce filed an opinion denying the motion. He dismissed the claim of involuntariness for reasons stated in part II of this opinion, and rejected the claim based on *Journet* on the ground that the *Journet* decision was inapplicable to guilty pleas taken before it was rendered. The court sentenced Saft to concurrent two year terms of imprisonment on counts three and six and a consecutive one year term on count 22. Later Judge Pierce assigned Saft's new counsel to prosecute this appeal. We affirm the conviction although, with respect to the contention relating to Rule 11, on a basis different from that relied upon by the district court.

## I.

There can be no fair basis for doubt that amended Fed.R.Crim.P. 11(c), which we reproduce in the margin,[3] governs all pleas taken after December 1, 1975. As appellant's brief points out, although the amended Rule 11 was adopted on July 31, 1975, Congress postponed the effective date of most of the Rule until December 1, 1975,[4]

---

2. On September 30 Fialkow pleaded guilty to two counts of submitting false financial statements; Weizer had pleaded guilty on September 20, 1976 to being an accessory after the fact. Both have been sentenced.

3. *Advice to Defendant.* Before accepting a plea of guilty or nolo contendere, the court must address the defendant personally in open court and inform him of, and determine that he understands, the following:

    (1) the nature of the charge to which the plea is offered, the mandatory minimum penalty provided by law, if any, and the maximum possible penalty provided by law; and

    (2) if the defendant is not represented by an attorney, that he has the right to be represented by an attorney at every stage of the proceeding against him and, if necessary, one will be appointed to represent him; and

    (3) that he has the right to plead not guilty or to persist in that plea if it has already been made, and that he has the right to be tried by a jury and at that trial has the right to the assistance of counsel, the right to confront and cross-examine witnesses against him,

and the right not to be compelled to incriminate himself; and

    (4) that if he pleads guilty or nolo contendere there will not be a further trial of any kind, so that by pleading guilty or nolo contendere he waives the right to a trial; and

    (5) that if he pleads guilty or nolo contendere, the court may ask him questions about the offense to which he has pleaded, and if he answers these questions under oath, on the record, and in the presence of counsel, his answers may later be used against him in a prosecution for perjury or false statement.

4. See § 2 of P.L. 94–64, 89 Stat. 370 (July 31, 1975):

    The amendments proposed by the United States Supreme Court to the Federal Rules of Criminal Procedure which are embraced in the order of that Court on April 22, 1974, are approved except as otherwise provided in this Act and shall take effect on December 1, 1975. Except with respect to the amendment to Rule 11, insofar as it adds Rules 11(e)(6), which shall take effect on August 1, 1975, the

for the very purpose of allowing district judges, prosecutors and defense lawyers to become familiar with it.[5] Congress did not intend to authorize district judges to defer compliance with the detailed requirements of amended Rule 11(c) until the court of appeals for their circuit directed them to do so. But the Rule does not say that compliance can be achieved only by reading the specified items *in haec verba*. Congress meant to strip district judges of freedom to decide *what* they must explain to a defendant who wishes to plead guilty, not to tell them precisely *how* to perform this important task in the great variety of cases that would come before them. While a judge who contents himself with literal application of the Rule will hardly be reversed, it cannot be supposed that Congress preferred this to a more meaningful explanation, provided that all the specified elements were covered.

■ Defense counsel claims that Judge Pierce failed to inform Saft of five of the elements required by Rule 11(c), although he does not dispute that in light of the practice of this circuit not to place the defendant under oath and fn. 6 to *United States v. Journet, supra*, 544 F.2d at 637, the failure to advise Saft with respect to

item (5) of the Rule is inconsequential. See *United States v. Michaelson*, 552 F.2d 472, 477 (2 Cir. 1977). We hold there was compliance with each of the other four requirements:

■ (1) Saft contends that the judge did not inform him of "the nature of the charge to which the plea is offered." Apart from the fact that this contention was not raised below, we find it to be without merit. Judge Pierce had each of the three counts read to the defendant and Saft acknowledged that he understood the charge. Beyond this the judge ascertained that Saft had previously read the indictment and had conferred about the charges with counsel who had explained them to him. The counts were simply phrased and readily understandable by a man with Saft's experience, education and intelligence. The contention that even in such circumstances the judge must deliver to the defendant the equivalent of a jury charge finds no support in the language of the Rule and runs counter to the legislative history. The Advisory Committee Notes state as follows:

Subdivision (c)(1) retains the current requirement that the court determine that the defendant understands the nature of the charge. This is a common require-

---

amendments made by . . . this Act, shall also take effect on December 1, 1975. The version of Rule 11(c) proposed by the Supreme Court, which was adopted by the Senate but was altered in conference to the current version proposed by the House, had been shorter. See 62 F.R.D. 271, 275:

*Advice to defendant.* The court shall not accept a plea of guilty or nolo contendere without first, by addressing the defendant personally in open court, informing him of and determining that he understands the following:
(1) the nature of the charge to which the plea is offered; and
(2) the mandatory minimum penalty provided by law, if any, and the maximum possible penalty provided by law for the offense to which the plea is offered; and
(3) that the defendant has the right to plead not guilty, or to persist in that plea if it has already been made; and
(4) that if he pleads guilty or nolo contendere there will not be a further trial of any kind, so that by pleading guilty or nolo contendere he waives the right to a trial.

The Court's order transmitting the amendments of the criminal rules to Congress specified an August 1, 1974 effective date. By P.L. 93–361, 88 Stat. 397 (July 30, 1974), Congress postponed the effective date of the Court's proposals until August 1, 1975. See 62 F.R.D. 271.

5. See the remarks of Representative Wiggins:

For the past 4 months Congress has considered these amendments. Congress has adopted without change many of [the proposals transmitted by the Supreme Court]. However, several have been rejected and several have been amended. The conferees agreed that the proposed amendments of the judicial conference as amended by H.R. 6799 should not take effect until December 1, 1975, so that all of the U.S. attorneys, the U.S. judges, and the practicing bar will have ample notice that Congress has amended the proposals of the judicial conference and adequate opportunity to study both the proposals and amendments. (121 Cong.Rec. H. 7863 (daily ed. July 30, 1975).)

ment. See ABA Standards Relating to Pleas of Guilty § 1.4(a) (Approved Draft, 1968); Illinois Supreme Court Rule 402(a)(1) (1970), Ill.Rev.Stat.1973, ch. 110A, § 402(a)(1). The method by which the defendant's understanding of the nature of the charge is determined may vary from case to case, depending on the complexity of the circumstances and the particular defendant. In some cases, a judge may do this by reading the indictment and by explaining the elements of the offense to the defendants. Thompson, The Judge's Responsibility on a Plea of Guilty, 62 W.Va.L.Rev. 213, 220 (1960); Resolution of Judges of U.S. District Court for D.C., June 24, 1959.

See also Representative Wiggins' remarks in apparent reference to the new Rule 11(c)(1):

The court has affirmative duties to inquire directly of the defendant at the time the defendant is pleading guilty to insure that the defendant knows what crime he is pleading guilty to . . . . (121 Cong.Rec. H 7863 (daily ed. July 30, 1975.)

Saft's reliance on *Irizarry v. United States,* 508 F.2d 960 (2 Cir. 1975), is unfounded in view of our later decision in *Seiller v. United States,* 544 F.2d 554, 562–63 (2 Cir. 1975), limiting *Irizarry* to instances where the charges were too complex to be susceptible of understanding by a mere reading to the particular defendant.

■ (2) Saft's next claim is that Judge Pierce did not adequately advise him under Rule 11(c)(3) of his right "to plead not guilty or to persist in that plea if it has already been made." It is perhaps enough to say that this is what the 20 pages of transcript were all about. More specifically, the judge asked Saft if he understood "that if you did not plead guilty to these charges you would have a right to a speedy and public trial by a jury of twelve people," at which he would enjoy the presumption of innocence and could be found guilty only by a unanimous verdict. Clearly the judge made Saft fully aware of his right to persist in his plea of not guilty and of the serious consequences of a change.[6]

■ (3) Continuing to parse Rule 11(c)(3), Saft complains that the judge did not advise him that if he exercised his right to go to trial he would have the right to the assistance of counsel.[7] This is the closest that defendant comes to showing non-compliance with the amended Rule. However, it would defy reality to suppose that Saft had any doubts on this score. In contrast to a defendant with retained counsel who might worry that his money might run out before or during trial, Saft had already been assigned counsel, and there was no suggestion that counsel would abandon him if he went to trial. Indeed the judge inquired during the plea proceeding whether Mr. Fox knew of any "legal defense which would prevail if you went to trial." Also Saft's affidavit in support of his motion to withdraw his guilty plea stated that prior to the opening of serious plea discussions in September 1976, "my attorney and I had looked forward to trial as the ultimate forum for proving that I am not guilty of the crimes charged." The Supreme Court has very recently instructed us not "to ignore the record and reality." *United States v. Washington,* 431 U.S. 181, 188, 97 S.Ct. 1814, 1819, 52 L.Ed.2d 238 (1977).

■ (4) Saft's final claim, that the judge did not give the advice required by Rule 11(c)(4), is easily answered. While the judge did not use the precise words of the Rule, he did inform Saft that by pleading guilty Saft abandoned the right to a bench trial as well as to a jury trial. We are not informed what other kind of trial there

6. The Advisory Committee Notes explain that this specific warning was thought to afford the best method of explaining the defendant's privilege against self-incrimination. Judge Pierce had previously explained to Saft that if he did not plead guilty, he would have the right to a trial at which he would enjoy the right to remain silent and the right to have no adverse inference drawn from such silence.

7. Rule 11(c)(2), dealing generally with advice on the right to counsel, requires this only "if the defendant is not represented by an attorney," as Saft was.

could be, nor can we suppose that Saft may have had some other such kind in mind.

If it were not for *United States v. Journet, supra,* we thus would have no doubt that the judge complied with amended Rule 11(c). Saft's insistence that *Journet* compels a different conclusion ignores how different a case that was. The Government's submission in *Journet* was not that there was compliance, which there plainly was not, but that the non-compliance was harmless error. Journet was not advised at all that the "maximum possible penalty", Rule 11(c)(1), included possible lifetime parole; the Government's only defense of this omission on appeal was that for a defendant who had been advised of a possible maximum 15-year sentence (and received a lesser one), the length of parole would be inconsequential. (Govt. *Journet* brief at 9–10). There was no advice of the right to counsel at trial; the closest the court had come to this was to say that at a trial "your lawyer would have a right to cross-examine" witnesses. (Govt. brief at 8–9). There was no advice as required by Rule 11(c)(3) that at a trial Journet would enjoy the privilege against self-incrimination; the best the Government could do to excuse this was to argue that the omission "does not cast substantial doubt on whether the plea was made knowingly and voluntarily. Nor is it likely that the defendant would not have plead had he received this additional advice." (Govt. brief at 9.) Finally the failure to advise that no further trial of any kind was to be held, Rule 11(c)(4), was

sought to be excused only on the lame basis that Journet had been warned that he was waiving a jury trial and the presumption of innocence and that the guilty plea "means that . . . you are guilty of Count 2 of this indictment." (Govt. brief at 8.)

■ *Journet* was thus a case of conceded failure to comply with several items of Rule 11(c) and this court's insistance on explicit and specific information of "each and every element enumerated in Rule 11", 544 F.2d at 634, must be read in that light.[8] This case is governed rather by *United States v. Michaelson, supra.* We there dealt with a situation where, as here, most of the claimed deficiencies were found to be non-existent,[9] and the case was ultimately narrowed to one conceded deficiency—the court's failure to advise Michaelson of his right not to be compelled to incriminate himself. This court refused to disturb the conviction. After pointing to certain mitigating circumstances and recognizing "that a major purpose of the amendments to Rule 11 and its strict reading in *Journet* is to avoid all such fine inquiries by establishing a detailed prophylactic check list," the court declined to reverse a conviction based on the guilty plea, pointing out that the plea was taken "before *Journet* authoritatively construed the amendments to Rule 11, and in a context where [the defendant] must have known his rights." 552 F.2d at 477. This is equally true here, and a similar decision is required as a matter of both principle and precedent.[10]

---

**8.** Indeed, the colloquy under consideration in *Journet* did not include explicit advice as to "the nature of the charge" beyond characterizing it as "a felony, which is a major crime" nor any express advice of a "right to plead not guilty or to persist in that plea"—points neither asserted on appeal nor addressed by the *Journet* court, but claimed to require reversal under *Journet* in this appeal.

**9.** On one of these, this case and *Michaelson* are virtually identical: Michaelson claimed, as does Saft, that there had not been compliance with Rule 11(c)(4). The *Michaelson* court branded this as "factually incorrect", accepting the Government's contention that the district judge's advice—that if the defendant persisted in a not guilty plea, he "would be entitled and would have a trial before either myself or a

jury and myself"—complied with the Rule. Judge Pierce was even more explicit on this point.

**10.** The court also noted "that the plea . . . was taken after the trial commenced". To the extent this supported the conclusion that the defendant "must have known his rights" in view of trial preparations, similar support may be found here in the fact that Saft's plea came shortly before the scheduled trial date.

We find no difficulty with the dictum of the writer of *Michaelson* in *Del Vecchio v. United States,* 556 F.2d 106, 109, that *Michaelson* "probably represents the limit of how far we should go in that direction [of not reversing for slight deviations from the letter of Rule 11] on

## II.

Saft's contention that it was error for the judge not to permit him to withdraw his guilty plea even if it was properly taken requires little discussion.

We set forth in the margin the relevant portion of Judge Pierce's opinion.[11] Saft's chief criticism is that the record does not support the statements that he had admitted guilt to his counsel. While this may be literally so, there remain the admissions of guilt which Saft made in open court and the affidavit of former counsel, submitted together with the motion for withdrawal, that Saft had revealed "certain facts that conflicted with his affirmance of innocence" and that counsel had advised Saft that "he should not enter a plea of guilty, unless he believed himself to be guilty"[12]—a belief Saft affirmed when his plea was taken.

Our decisions have recognized the large discretion confided to district judges in passing on motions to withdraw pleas of guilty under Fed.R.Crim.P. 32(d), a discretion justified by the much better "feel of the case" possessed by the judge who observed the defendant at the taking of the plea than can be imparted by any appellate transcript, see *Cone v. West Virginia Pulp & Paper Co.,* 330 U.S. 212, 216, 67 S.Ct. 752, 91 L.Ed. 849 (1947). The judge's denial of the motion was well within the power recognized by such decisions as *United States v. Panebianco,* 208 F.2d 238, 239 (2 Cir. 1953), *cert. denied,* 347 U.S. 913, 74 S.Ct. 478, 98 L.Ed. 1069 (1954); *United States v. Fernandez,* 428 F.2d 578, 580 (2 Cir. 1970); and *United States v. Lombardozzi,* 436 F.2d 878, 881 (2 Cir.), *cert. denied,* 402 U.S. 908, 91 S.Ct. 1379, 28 L.Ed.2d 648 (1971). The

a direct appeal." While each case must stand on its own, we do not believe we are here going further than *Michaelson,* and the problem will shortly disappear as the teachings of *Journet* are taken to heart.

We likewise are not impressed by the point that Judge Pierce evidently thought he had not complied with amended Rule 11 if *Journet* were "retroactive." The judge did not have the benefit of the *Michaelson* opinion, and we are in as good a position to determine his compliance as he was.

11. This Court presided over the taking of Saft's plea of guilty. The transcript of that proceeding demonstrates that Saft's plea was, in the traditional sense of the word, voluntary when made. This Court, upon listening carefully to the defendant's answers during the allocution and observing his demeanor, was fully satisfied that the plea of guilty was a knowing and voluntary decision, made following consultation with counsel. . . . The Court has no doubt that Saft's decision to plead guilty was a difficult one; however, that does not mean that it was involuntary. This Court does not believe that a plea is rendered involuntary simply because a defendant, following a plea, changes his mind and decides that he might be better off proceeding to trial or retaining different counsel.

Although Saft now asserts that he is innocent of the charges, those allegations are in the main conclusory, particularly with respect to Count 22. He claims that his attorney pressured him into a plea; however, upon a review of Saft's own affidavit and the affidavit of his former attorney, it is clear that contrary to his allegations, Saft did ad-

mit guilt to his former attorney in the course of their preparation for the plea allocution. The Court concludes that Saft's former counsel did not "importune" the defendant. . . .

Indeed, even taking all the factual allegations of defendant's moving papers at face value, the Court does not conclude thereby that the plea was involuntary. The Court does not find itself persuaded that the circumstances eliminated Saft's free will or that he was unduly pressured by his attorney. Rather, Saft's own affidavit reveals that he decided to plead guilty several days before the pleading and that his attorney informed him that, in the final analysis, the decision to plead guilty was Saft's alone. Having found that Saft admitted guilt to his counsel, having taken the plea and observed the demeanor of the defendant, and having determined at that time that the plea was voluntary, the Court has read nothing in the submissions that leads it to conclude otherwise now.

12. In a reply affidavit submitted after a memorandum for the Government had contended that, because of this averment of counsel, *United States v. Rogers,* 289 F.Supp. 726 (D.Conn. 1968), on which Saft had relied, was inapplicable, Saft stated that he did not recall and did not believe that his former counsel had so advised him. In light of Saft's admissions in open court and the fact that he had himself submitted counsel's affidavit, it was not error for the judge to have declined to direct a hearing on this belated attempt at contradiction, especially when no specific request for a hearing on this point was made.

Supreme Court's remarks in *Brady v. United States,* 397 U.S. 742, 754–55, 90 S.Ct. 1463, 25 L.Ed.2d 747 (1970), are also applicable. Saft argues that the Government would not have been prejudiced by the granting of his motion, since it was made before sentence and within a relatively short time after the plea was taken; he claims that the Government may even be better off since his co-defendants are no longer able to assert their privilege against self-incrimination. The Government is not required to show prejudice when a defendant has shown no sufficient grounds for permitting withdrawal of a guilty plea, although such prejudice may be considered by the district court in exercising its discretion, see *United States v. Giuliano,* 348 F.2d 217, 222 (2 Cir.), *cert. denied,* 382 U.S. 939, 86 S.Ct. 390, 15 L.Ed.2d 349 (1965); *United States v. Lombardozzi, supra,* 436 F.2d at 881; *United States v. Michaelson, supra,* 552 F.2d at 474–475, & n. 3. Moreover, if, as the Government represents, the co-defendants had agreed to cooperate, its litigating stance may in fact be worse after their sentencing than it was before.

The judgment is affirmed.