

1995 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

1-10-1995

# USA v Alonzo Harris

Precedential or Non-Precedential:

Docket 93-3632

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1995

Recommended Citation

"USA v Alonzo Harris" (1995). *1995 Decisions.* Paper 9.
http://digitalcommons.law.villanova.edu/thirdcircuit_1995/9

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1995 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT


NO. 93-3632


UNITED STATES OF AMERICA

v.

ALONZO L. HARRIS
a/k/a "Letter"

Alonzo L. Harris,
Appellant


On Appeal From the United States District Court
For the Western District of Pennsylvania
(D.C. Crim. Action No. 93-cr-00123)


Argued June 23, 1994

BEFORE:  STAPLETON and GREENBERG, Circuit Judges, and
         FARNAN,* District Judge

(Opinion Filed January 10, 1995)


                    Thomas S. White
                    Federal Public Defender
                    W. Penn Hackney, First Asst.
                    Federal Public Defender
                    Karen Sirianni Gerlach (Argued)
                    Asst. Federal Public Defender
                    415 Convention Tower
                    960 Penn Avenue
                    Pittsburgh, PA 15222
                    Attorneys for Appellant
                    Alonzo L. Harris

                    Frederick W. Thieman
                    United States Attorney
                    Paul J. Brysh (Argued)
                    Assistant U.S. Attorney
                    Bonnie R. Schlueter
                    Office of U.S. Attorney
                    633 U.S. Post Office & Courthouse
                    Pittsburgh, PA 15219
                    Attorneys for Appellee

OPINION OF THE COURT

STAPLETON, Circuit Judge:

Alonzo Harris entered a conditional guilty plea to each of five counts charging him with armed bank robbery. His appeal from his conviction presents five issues: whether the court erred (1) in refusing to suppress a series of inculpatory statements given by Harris to various law enforcement personnel; (2) in declining to allow Harris to withdraw his plea on the eve of sentencing; (3) in failing to provide a sufficient explanation for its decision to raise Harris' criminal history level from category I to category VI pursuant to U.S.S.G. § 4A1.3; (4) in adding four points to Harris' offense level because the mace the district court found he had used on two tellers during one of the robberies was a "dangerous weapon" within the meaning of U.S.S.G. § 2B3.1(b)(2)(D); and (5) by enhancing Harris' offense level an additional two points because, as a result of being "maced," the tellers sustained "bodily injuries" within the meaning of U.S.S.G. § 2B3.1(b)(3)(A). We will remand for resentencing.

I.

On May 7, 1993, the Pittsburgh police obtained an arrest warrant for Harris in connection with a shooting at the Hampton Inn in the Oakland section of the city. Harris voluntarily surrendered the next day and was taken into custody. During the remainder of that day and the next, Harris provided the authorities with extensive tape recorded and written statements detailing his role in five bank robberies which occurred in 1992. Prior to the making of these statements, the police had not suspected him of committing any of these robberies.

Harris first described the robbery of the Morningside Branch of the Laurel Savings Association. According to Harris' statement, he drove to the bank in a van with a friend, Charlie Brown. As Harris entered the bank, he carried a pellet gun and a can of mace. According to Harris, he took money from two tellers and, as he fled, attempted to spray mace at one of them to prevent her from seeing the direction in which he fled.

Harris next described an October 23, 1992, robbery of the Fidelity Savings Association on East Ohio Street in Pittsburgh. Brown carried a pellet gun into the bank and took money from a teller, while Harris picked money out of a cash drawer.

On the day after being taken into custody, Harris talked about the other three robberies at issue here. First, he described the July 30, 1992, robbery of the Allegheny Valley Bank

in Blawnox, during which he carried a toy gun. Next, Harris spoke of the June 29, 1992, robbery of the Laurel Savings Association in Etna. On this occasion, Harris carried a can of mace and Brown carried a gun. After a teller gave them the money in her cash drawer, Harris sprayed mace in the air. Finally, Harris described the June 15, 1992, robbery of the Integra Bank in New Kensington. Harris and a man named "Vernor" were wearing ski masks and had one gun between them.

After Harris made these initial statements, the FBI was contacted. On May 11, 1993, FBI agents obtained further statements from Harris regarding his role in several other crimes.

After being indicted for the robberies that occurred in 1992, Harris filed a motion to suppress the statements he had given. Following an evidentiary hearing, the district court denied Harris' motion. Harris thereafter entered conditional pleas of guilty to the five counts of the indictment charging armed bank robbery and thereby preserved the suppression issue for appellate review.

On November 30, 1993, after the presentence report had been prepared and Harris' sentencing had been set for December 3, 1993, Harris filed a motion to withdraw his guilty pleas. At the hearing originally scheduled as a sentencing hearing, the district court denied this motion, heard argument on several sentencing issues, and made tentative findings with respect to those issues. Counsel was given permission to file objections to

the tentative findings by December 6, 1993, and sentencing was continued until that date.

Harris was ultimately assigned a total offense level of 32, a criminal history category of VI, and a guideline sentencing range of 210-262 months. He was sentenced to concurrent 21-year terms of imprisonment (252 months); five years of supervised release; payment of restitution to the victim banks in the sum of $25,783; and a special assessment of $225.

## II.

Harris insists that the statements he sought to suppress were coerced. The district court found that they were not. We review the district court's finding of historic fact for clear error; our review of its ultimate conclusion regarding the absence of coercion is plenary. Miller v. Fenton, 474 U.S. 104, 115-17 (1985); United States v. Walton, 10 F.3d 1024, 1027 (3d Cir. 1993).

In support of his contention that his "will was overborne" and that the waiver of his constitutional rights was not "the product of a rational intellect and a free will," App. 97, Harris testified that he was intimidated by the fact that his legs were shackled, the fact that he was not free to leave the room in which he was questioned, and the fact that the officers with him in the room were wearing guns. He also testified that he had consumed forty ounces of "Old English" before he surrendered himself and that the effects of this consumption had not dissipated when he decided to confess.

The district court found that Harris had been advised of his constitutional rights on at least three occasions and that he had "voluntarily and understandingly" waived those rights. App. 149. It noted that the audio tapes established that Harris was "calm and rational" and "had no fear in his voice." Id. The court further noted that Harris had voluntarily surrendered and, as evidenced by Harris' own statements on the tape, he had been treated well by both the Pittsburgh police and the FBI. Finally, the court found that there was "no evidence" of threats, promises or pressures of any kind and "no credible evidence" that Harris was under the influence of alcohol. App. 149, 150.

There is ample evidence to support the district court's findings regarding the circumstances under which Harris' statements were given and, based on these findings, we conclude that Harris waived his constitutional rights voluntarily and with an understanding of the consequences of doing so.

### III.

At the hearing on his motion to withdraw his guilty pleas, Harris testified that "it was fear that drove" him to plead guilty and that he wanted to withdraw those pleas because he was "truly innocent." App. 193. However, he did not further explain the "fear" that had allegedly coerced the pleas, and he offered no evidence tending to show that the detailed accounts of the bank robberies in his statements were untrue. The district court declined to permit withdrawal. We will review its ruling

under an abuse of discretion standard.  United States v. Huff, 873 F.2d 709, 712 (3d Cir. 1989).

Quoting from United States v. Jones, 979 F.2d 317, 318 (3d Cir. 1992), the district court explained that a "defendant must . . . not only reassert [his] innocence, but give sufficient reasons to explain why contradictory positions were taken before the district court and why permission should be given to withdraw the guilty plea."  App. 200.  The court concluded that Harris had failed to explain his earlier statements and that, accordingly, his conclusory assertion of innocence was not credible.  It further concluded that the reason Harris wanted to change his pleas was that he "had a change of heart after reading the presentence report and contemplating the possible sentence."  App. 200.  Citing United States v. Huff, 873 F.2d 709, 712 (3d Cir. 1989), the court concluded that this reason was inadequate to justify withdrawal.  Finally, the district court noted that, under Third Circuit jurisprudence, withdrawal may be denied in circumstances like those before it even if no prejudice to the government is shown.  See United States v. Martinez, 785 F.2d 111 (3d Cir. 1986).[1]

---

[1].  In Martinez, we observed:

> In evaluating a motion under Rule 32(d), we have looked primarily to three factors: "(1) whether the defendant asserts his innocence; (2) whether the government would be prejudiced by withdrawal; and (3) the strength of the defendant's reasons for moving to withdraw."  [United States v. Trott, 779 F.2d 912, 915 (3d Cir. 1985).]

* * * *

We can find no fault with the district court's analysis, and its decision to deny the permission sought was well within the bounds of its discretion.

## IV.

Having concluded that Harris' conviction must stand, we turn to the more troublesome sentencing issues that he raises. The first concerns the district court's decision to raise his criminal history level from category I.

> U.S.S.G. § 4A1.3 provides in relevant part:
> > If reliable information indicates that the criminal history category does not adequately reflect the seriousness of the

(..continued)

> . . . Martinez urges us to adopt the position of a minority of the courts of appeals that absent any showing of prejudice to the government, withdrawal should be freely granted. See generally United States v. Thompson, 680 F.2d 1145, 1150-51 (7th Cir.), cert. denied, 459 U.S. 1089, 103 S. Ct. 573, 74 L. Ed. 2d 934 (1982). We are constrained, however, to reject this position as contrary to the 1983 amendments to Rule 32(d). The Advisory Committee Notes to the 1983 amendments state that amended Rule 32(d) embodies the approach of United States v. Saft, 448 F.2d 1073 (2d Cir. 1977). Under that approach, "[t]he Government is not required to show prejudice when a defendant has shown no sufficient grounds for permitting withdrawal of a plea." Id. at 1083. Thus, even assuming that the government has failed to show prejudice, we must affirm the district court's decision because Martinez has failed to demonstrate sufficient grounds for withdrawing his plea.

785 F.2d at 114, 115-16.

defendant's past criminal conduct or the likelihood that the defendant will commit other crimes, the court may consider imposing a sentence departing from the otherwise applicable guideline range.  Such information may include, but is not limited to, information concerning: . . .  (e) prior similar adult criminal conduct not resulting in a criminal conviction.

A departure under this provision is warranted when the criminal history category significantly under-represents the seriousness of the defendant's criminal history or the likelihood that the defendant will commit further crimes.

* * * *

In considering a departure under this provision, the Commission intends that the court use, as a reference, the guideline range for a defendant with a higher or lower criminal history category, as applicable. For example, if the court concludes that the defendant's criminal history category of III significantly under-represents the seriousness of the defendant's criminal history, and that the seriousness of the defendant's criminal history most closely resembles that of most defendants with Criminal History Category IV, the court should look to the guideline range specified for a defendant with Criminal History Category IV to guide its departure.

In United States v. Hickman, 991 F.2d 1110 (3d Cir. 1993), this court remanded a case for resentencing because it found that the district court had not properly completed the necessary step-by-step procedure that must occur prior to an increase under U.S.S.G. § 4A1.3.  In Hickman, the defendant's prior record placed him in criminal history category III.  The district court, however, believed that this resulted in a

sentence which did not adequately represent Hickman's long history of similar conduct.  Therefore, it departed upward under § 4A1.3 by "doubling the top of the guideline range."  Id. at 1113.  The district court gave no further explanation for the specific sentence.  The record, however, reflected that the court was motivated by the fact that Hickman, at 65, was still engaged in criminal activity even though his history of fraud type offenses went back to 1953.

This court held in Hickman that a district court must follow the procedure contemplated by § 4A1.3 when choosing to depart upward from the criminal history category originally calculated for the defendant.

> Under this [§ 4A1.3] regime, the court is obliged to determine which category (of those higher than the category originally calculated for the defendant) best represents the defendant's prior criminal history.  The court then uses the corresponding sentencing range to "guide its departure."  Moreover, the court is obliged to proceed sequentially through these categories.  It may not move to the next higher category until it has found that a prior category still fails to adequately reflect the seriousness of the defendant's past criminal conduct.

Id. at 1114.  We then went on to quote the following passage from a Second Circuit case:

> The reason for obliging a judge to examine the next higher categories in sequence is that these categories reflect the Commission's careful assessment of how much incremental punishment a defendant should receive in light of the various degrees of a prior record.

<u>Id.</u> at 1114 (quoting <u>United States v. Coe</u>, 891 F.2d 405, 413 (2d Cir. 1989)).  We ultimately concluded that, although the district court was justifiably outraged by the defendant's long history of fraud, the court erred when it "jumped more than three criminal history categories without explanation and, a fortiori, without going through the ratcheting procedure prescribed by the Guidelines."  <u>Id.</u>

        The presentence report in this case found that Harris had only one criminal history point resulting from a 1992 conviction of robbery, reckless endangerment, and related offenses.  Thus, the report gave him a criminal history category of I.  However, the presentence report also listed Harris' extensive criminal background as a possible ground for departure. The report indicated that Harris was currently charged in four pending state prosecutions in Allegheny County.  The first prosecution involved a murder.  The second was for robbery and assault.  The third prosecution consisted of 16 counts of robbery of various business establishments.  The fourth consisted of 12 counts of robbery of other businesses.  According to the report, Harris had confessed his involvement in all of the pending charges.  Harris also admitted that he had been present at a drug-related murder committed by another.

        At sentencing, the district court exercised the authority conferred upon it by § 4A1.3, with the following explanation:

>         According to the probation officer, the
>         criminal history category is one.

However, the probation officer stated
that he believed the defendant's criminal
behavior constitutes a criminal history
category which is higher.  We find that the
appropriate criminal history category in this
case is six.

We find that the application of criminal
history categories two, three, four and five
are too lenient for the conduct in this case.

* * * *

Hence, we find [that] the information
[concerning the defendant's criminal
activity] is reliable and we further find
that it is highly likely that if released,
the defendant will commit other predatory
street crimes.

App. 277, 278.  After describing the crimes charged in the

indictments to which Harris had confessed, the court concluded:

Mr. Harris is a predatory street
criminal who has a propensity for violence of
the most egregious type.  We find that he is
a danger to the community and will repeat
similar offenses if released.

App. 279-80.

We agree with the government that Hickman does not

"require the district court to go through a ritualistic exercise

in which it mechanically discusses each criminal history category

it rejects en route to the category that it selects."  United

States v. Lambert, 984 F.2d 658, 663 (5th Cir. 1993)(en banc).

Hickman and the objective of the § 4A1.3 ratcheting process do

require, however, that the sentencing court's reasons for

rejecting each lesser category be clear from the record as a

whole.  While it is clear to us from the record that the district

court justifiably regarded Harris' past record as horrendous and

his prospects for the future abysmal, the requirements of § 4A1.3 are not met by its declaration that "criminal history categories two, three, four and five are too lenient for the conduct in this case." App. 277.

First, the district court's conclusion that the lesser categories were "too lenient" suggests to us that its focus may have been on whether the result produced by the ratcheting process was appropriate, that is, on whether the sentencing range arrived at by using the lesser intervening categories was too lenient, in the eyes of the district court, for someone with Harris' past conduct and prospects for the future. This is precisely the kind of subjective judgment the ratcheting process was designed to avoid. The proper focus of § 4A1.3 analysis is a comparison of the frequency and seriousness of the conduct comprising the defendant's criminal history with the conduct of others who fall into each category.

Even if it were reasonably clear that the district court's analysis had the appropriate focus, however, we would still find the cryptic articulation of its reasoning too conclusory to permit us to perform our review function and attempt to assure the uniformity of sentencing that Congress sought to achieve. The insufficiency of the district court's explanation concerning the appropriateness of criminal history category VI and the inappropriateness of each lesser category is well illustrated by a consideration of the contentions of the parties regarding the appropriate criminal history category, contentions that were not commented upon by the district court.

Harris contends that he should be assigned a criminal history category no higher than the category he would have been assigned if he had been convicted of the charges reported by the presentence report to be pending against him. According to Harris, this would be a category III. He argues that if he were convicted for the crimes in paragraphs 86-89 of the presentence report, which were the basis for the upward departure, he would only receive a total of 6 points beyond the single point resulting from his conviction. The presentence investigator reported that under an existing plea agreement Harris would receive a single term of life imprisonment for all these crimes. Since he was to receive only one sentence for the four pending cases, according to Harris, these cases should be treated as yielding only one prior sentence under § 4A1.1(a).[2] Thus, he would receive 3 points under § 4A.1(a), which directs the courts to add "3 points for each prior sentence of imprisonment exceeding one year and one month." Harris admits that he would also receive 3 additional points since all of the crimes involved violence.[3] Harris thus concludes that if he had been sentenced

---

[2]. Section 4A1.2(a)(2) states that "[p]rior sentences imposed in related cases are to be treated as one sentence for purposes of § 4A1.1(a), (b), and (c)." The commentary to § 4A1.2 states that prior cases are "related" if they "were consolidated for trial or sentencing." U.S.S.G. § 4A1.2, comment. (n.3).

[3]. Under § 4A1.1(f), the court is directed to add "1 point for each prior sentence resulting from a conviction of a crime of violence that did not receive any points under (a), (b) or (c) above because such sentence was considered related to another sentence . . . up to a total of 3 points." Thus, since all four prior cases involved crimes of violence, and since three of those cases did not receive additional points under § 4A1.1(a), one

for the four cases pending in the Court of Common Pleas, he would have 6 total criminal history category points, placing him in category III, rather than category VI.

The government, on the other hand, points out that if each case charged in paragraphs 86-89 of the presentence report were resolved separately and Harris were sentenced in each case, he would receive an additional three points for each case, amounting to 12 additional points, enough to place him in category VI. This, the government insists, is the relevant consideration when the court is attempting to find the criminal history category that adequately reflects the defendant's prior criminal conduct and future prospects.

The task before the sentencing court in these circumstances is to identify the category which encompasses those defendants whose criminal histories "most closely resemble[]" the defendant's own. See U.S.S.G. § 4A1.3. Where the defendant has confessed to the commission of serious crimes for which he has not been convicted, it would certainly seem to us reasonable for a sentencing court to consider what the defendant's criminal history category would be if he had been convicted of those crimes. Moreover, when the conduct underlying the defendant's prior offenses is as transactionally unrelated as the conduct underlying the four prosecutions against Harris, adoption of the government's approach by the sentencing court would provide a

(..continued)
point for each of those cases would be added. See U.S.S.G. § 4A1.1, comment. (n.6).

sustainable basis for rejecting categories II, III, IV and V and embracing category VI. It is impossible to determine from this record, however, whether the district court adopted the government's approach. As we have noted, it commented on neither the government's nor Harris' analysis. This is not to say that § 4A1.3 limits the court's discretion in a situation of this kind to a guideline calculation of the points that would have been received if pending charges were convictions. Indeed, § 4A1.3 is intended to provide flexibility in those cases where a point-by-point calculation of the defendant's criminal history category is not alone sufficient to reflect his culpability and dangerousness.[4] To this end, it confers discretion on the district court to consider the particular facts relating to a defendant's past criminal conduct in reaching a judgment on the seriousness of that conduct and the likelihood of recidivism.

A consideration of the relevant reliable data in this case could clearly lead a sentencing court to a conclusion that anything less than category VI would underrepresent the defendant's past criminal conduct. That is not the problem here. The problem is rather that we do not know what it was about the particular facts of Harris' case that led the district court to

---

[4]. It is for this reason that we reject Harris' argument that his calculation leading to a criminal history category of III places a ceiling on the district court's authority to depart upward. We also note that his calculation may be flawed. If Harris is awarded an additional point for the conviction of armed robbery detailed in paragraph 81 of the presentence report, his total points, even adopting his theory, would appear to be 7, placing him in category IV.

believe him more culpable and more dangerous than those for whom categories II, III, IV and V were intended.  Accordingly, our decision in Hickman mandates resentencing.

                                    V.

        The district court gave Harris a four point upward adjustment in calculating the sentence for the robbery charged in count IV because it viewed the mace Harris was found to have used on two tellers as a "dangerous weapon" within the meaning of U.S.S.G. 2B3.1(b)(2)(D).[5]  A "dangerous weapon" is defined in the Guidelines as "an instrument capable of inflicting death or serious bodily injury."  U.S.S.G. § 1B1.1, comment. (n.1(d)).  In turn, the Guidelines define a serious bodily injury as an "injury involving extreme physical pain or the impairment of a function of a bodily member, organ, or mental faculty; or requiring medical intervention such as surgery, hospitalization, or physical rehabilitation."  U.S.S.G. § 1B1.1, comment. (n.1(j)).  Because the adjusted offense level for count IV was higher than the adjusted offense levels for the other four counts, it determined Harris' combined adjusted offense level.  See U.S.S.G. § 3D1.4.

        The spray that Harris used during this bank robbery was a product called Phaser Mace which Harris purchased at an Army & Navy Store.  At the hearing, the government, in support of its position that Phaser Mace spray was a dangerous weapon,

---

[5].  U.S.S.G. § 2B3.1(b)(2)(D) provides:  "if a dangerous weapon was otherwise used [during a robbery], increase by 4 levels."

introduced a promotional "Bulletin" about a "pepper spray." The bulletin had been issued by Zarc International, Inc., the manufacturer of CAP-STUN, "an oleoresin capsicum ('OC') product used safely by law enforcement for more than a decade." App. 230. This document reported the death of a man whom police had sprayed with a product called First Strike, a "pepper spray" manufactured by a competitor. The autopsy report was reported to have concluded the cause of death to be "asphyxia due to bronchospasm precipitated by pepper spray." Id. The Bulletin was careful to distinguish First Strike from CAP-STUN, which "has undergone extensive toxicological testing and has proven to present no potential danger to the human physiological system." App. 231. It noted that First Strike's ingredients were a "trade secret" and thus unknown and that it was "delivered in a liquid stream." Id. The Bulletin further cautioned that "until the ongoing investigations [into the death] are completed, conclusions about First Strike would be premature." App. 230.

The government also tendered the testimony of the probation officer who had prepared the presentence report. He expressed the opinion that, if a pepper spray could cause the death reported in the Bulletin, then the mace used by Harris "could also cause serious bodily injury." App. 241-42.

The only other relevant evidence before the district court on this issue was (1) a pamphlet tendered by Harris which had been published by the makers of Phaser Mace, and (2) the testimony of an FBI agent who arrived at the scene of the robbery and spoke with the tellers who had been sprayed. The pamphlet

asserted that Phaser Mace had been used for many years without serious injury and that its effects lasted no longer than 10 to 15 minutes.  As the government stresses, however, it also states:

> When an individual(s) receives a blast from the PHASER, he will experience extreme discomfort and disorientation.  The first is usually a severe stinging/burning sensation to any affected part of the body.  This is followed immediately by involuntary closing of the eyes due to the swelling of blood vessels causing temporary blindness.  The victim will then experience respiratory problems and a choking sensation.  All of this will occur within a matter of 1-2 seconds.  It is important to keep in mind that all this is happening to an individual who is totally unsuspecting.  In the vast majority of occurrences the victim will also experience disorientation which creates a feeling of panic to accompany the other symptoms.  These symptoms will last from 10-15 minutes.

> * * * *

> A one second burst of PHASER is sufficient to incapacitate the average person.

App. 234.

> On direct, the FBI agent testified:
> Q.  Did you debrief the two tellers concerning that bank:
>
> A.  Yes.
>
> Q.  Did they relate to you whether they were in need of any medical attention after being sprayed in the face with the mace by the defendant in this case?
>
> A.  Yes.  An ambulance showed up, according to [the] teller, [sic] they both required medical attention for their eyes, and one had problems breathing.  She had an asthma condition, I believe.

App. 257-58.

On cross-examination, the agent provided the following context for his direct testimony:

Q.  Now, you said that paramedics showed up after the robbery?

A.  Yes.

Q.  And they were treated by the paramedics, the two tellers, both tellers?

A.  Yes, both of them received medical attention on the scene.

Q.  That consisted of what -- washing out their eyes?

A.  I wasn't present.  All I observed was the emergency medical personnel walk into the bank and go towards both tellers.  At that point I left the bank.

Q.  So you don't know what type of treatment they were given?

A.  No, sir.

Q.  Neither teller was placed in the ambulance and taken to the hospital; is that correct?

A.  Neither of them left the bank to the best of my knowledge.

* * * *

Q.  They were both able to talk to you?

A.  Yes.

Q.  And you interviewed them within an hour after their treatment, maybe less?

A.  Probably less.

Q.  Half hour, maybe even less than that . . .?

A.  Half hour.

App. 258-59.

The district court's findings on this issue and the one addressed in the next section of this opinion were articulated together at the sentencing hearing:

> The probation officer . . . added four points because the defendant used a dangerous weapon, that is, spraying mace in the face of the bank teller and thereby increased his base offense level by four.
>
> That conclusion is supported by a preponderance of the evidence.  The probation officer then added two additional points because the offense involved the spraying of mace in the face of a bank teller and increased two levels for bodily injury, generating an adjusted offense level of 28. Each of those findings are supported by a preponderance of the evidence.
>
> We find that use of mace during the commission of a felony constitutes infliction of serious bodily injury with a dangerous weapon.  The evidence preponderates the use of mace is a dangerous weapon and constitutes infliction of serious bodily injury.
>
> . . . we find that a victim of mace sustains a significant injury.  Indeed, there is evidence of record, too, that two tellers required immediate medical attention, and there is further evidence of record of a death that was caused in North Carolina following the application of mace.  Such evidence should not be ignored.

App. 274-75.

The parties agree that the government had the burden of proving by a preponderance of the evidence that Harris used an "instrument capable of inflicting death or serious bodily

injury." See United States v. Miele, 989 F.2d 659, 663 (3d Cir. 1993). Moreover, we have insisted that "[i]nformation used as a basis for sentencing under the Guidelines must have 'sufficient indicia of reliability to support its probable accuracy.'" Id. (quoting U.S.S.G. § 6A1.3(a)). Indeed, we have counseled that "this standard should be applied rigorously." Id. at 664.

We hold that the government did not meet its burden and that the district court erred in adding four points to the sentencing calculation for count IV based on the current record. The Zarc Bulletin lacked sufficient indicia of reliability for the purpose for which it was used by the district court. First, it was promotional literature emanating from a competitor of the product which may have caused the reported death in North Carolina. Second, even this competitor, with its inherent bias, acknowledged that the limited information about the incident rendered conclusions about the dangerousness of First Strike "premature." Third, and most important, the district court lacked any basis for determining what First Strike is and whether it bears any significant resemblance to Phaser Mace. The probation officer's testimony, based as it was on the Bulletin, similarly lacked reliability.

The most probative evidence available to the district court of the capabilities of Phaser Mace was its own promotional literature. That literature reported that it had been used for many years without serious injury. Although the district court would have been justified in discounting this claim on the basis of its source, a discounted claim cannot carry the government's

burden in the absence of any evidence calling it into question. The remainder of the pamphlet provides no reason to question that claim. While it describes "temporary blindness," "respiratory problems," "a choking sensation," "disorientation," and a "feeling of panic," all of this is accompanied by the assurance that these effects last only 10 or 15 minutes and leave no residual incapacity.

Phaser Mace is thus clearly reported in its promotional literature to be incapable of causing death. Although that literature refers to "extreme discomfort," we do not believe that this claim, particularly given its self-serving nature, provides a reliable basis for concluding that Phaser Mace inflicts "extreme pain" as that term is used in the definition of serious bodily injury. It necessarily follows that the promotional pamphlet provides an inadequate basis for concluding that Phaser Mace is a dangerous weapon. Finally, the very limited testimony of the FBI agent about the effect of Phaser Mace on the two tellers is entirely consistent with the claims of the pamphlet and adds little to the government's case.

VI.

The final issue presented by this appeal is whether the district court erred when it increased Harris' offense level for count IV by two under U.S.S.G. § 2B3.1(b)(3)(A) because two tellers were found to have sustained "bodily injuries" as a result of being sprayed with mace.

Section 2B3.1(b)(3) establishes a graduated scale for those cases in which a victim "sustained bodily injury":

If any victim sustained bodily injury, increase the offense level according to the seriousness of the injury:

| Degree of Bodily Injury | Increase in Level |
|---|---|
| (A) Bodily Injury | add 2 |
| (B) Serious Bodily Injury | add 4 |
| (C) Permanent or Life-Threatening Bodily Injury | add 6 |

(D) If the degree of injury is between that specified in subdivisions (A) and (B), add 3 levels; or

(E) If the degree of injury is between that specified in subdivisions (B) and (C), add 5 levels.

The Application Notes of U.S.S.G. § 1B1.1 provide the following definitions for the terms used in this graduated scale:

"Bodily injury" means any significant injury; e.g., an injury that is painful and obvious, or is of a type for which medical attention ordinarily would be sought.

"Serious bodily injury" means injury involving extreme physical pain or the impairment of a function of a bodily member, organ, or mental faculty; or requiring medical intervention such as surgery, hospitalization, or physical rehabilitation.

"Permanent or life-threatening bodily injury" means injury involving a substantial risk of death; loss or substantial impairment of the function of a bodily member, organ, or mental faculty that is likely to be permanent; or an obvious disfigurement that is likely to be permanent.

Where a particular situation falls on this analogue scale is an issue the Commission clearly intended to be resolved

on a case-by-case basis after a fact-specific inquiry into the circumstances of the particular crime and its impact on the victims.  See United States v. Robinson, 20 F.3d 270, 278-79 (7th Cir. 1994); United States v. Lancaster, 6 F.3d 208 (4th Cir. 1993).  A sentencing court's resolution of this issue is a finding of fact that will be disturbed on appellate review only if clearly erroneous.  See United States v. Ortiz, 878 F.2d 125, 126 (3d Cir. 1989).

The district court in this case made only one brief reference to the particular circumstances of this case, citing the FBI agent's testimony that the tellers "required immediate medical attention."  The court's primary focus, however, was not on what happened in this case.  It found the reported North Carolina death important and cast its ultimate finding in terms of the non-case-specific conclusion that "a victim of mace sustains a significant injury."  App. 275.

The difficulty with the district court's approach can best be illustrated by comparing two cases from other courts of appeals which present the question of whether a victim of the defendant's crime had received "bodily injury" from mace.

In United States v. Lancaster, 6 F.3d 208 (4th Cir. 1993), a security guard had been sprayed with mace during a robbery and had suffered "severe burning in his eyes and cheeks." Id. at 209.  The district court found that no "bodily injury" occurred.  The court of appeals held that this finding was not clearly erroneous.  In the course of doing so it observed:

> While the burning in [the security guard's]
> eyes and cheeks caused by the mace was
> undoubtedly unpleasant, and could not be
> described as wholly trivial, it was only
> momentary and the mace produced no lasting
> harm.

Id. at 210.

The Lancaster court gave the following explanation of why the district court's finding was consistent with the Guideline's definition of "bodily injury" as, inter alia, "an injury that is painful and obvious, or is of a type for which medical attention ordinarily would be sought."  U.S.S.G. § 1B1.1, comment. (n.1(b)).

> Trivial injuries are not noticeably painful
> nor are they normally obvious to an observer.
> A momentary injury may be immediately
> "painful," but it is not "obvious" as we feel
> that term is intended in this context because
> it disappears quickly.
>
> It is also consistent with Application
> Note 1(b)'s elaboration of "significant
> injury" as being an injury "of a type for
> which medical attention ordinarily will [sic]
> be sought."  Medical attention is not
> ordinarily sought for wholly trivial
> injuries.  And while people who have
> sustained purely momentary injuries may often
> choose to be examined by a doctor as a
> precautionary measure to ensure that they
> have sustained no lasting harm, we do not
> understand such precautionary examinations to
> be the type of "medical attention" that the
> Guidelines contemplate to make an injury
> "significant."

Lancaster, 6 F.3d at 210 n.2.

In United States v. Robinson, 20 F.3d 270 (7th Cir. 1994), the court upheld, as not clearly erroneous, the district

court's determination that bank tellers had suffered a "bodily injury" after being sprayed with mace:

> The bank tellers who were sprayed experienced pain which lasted for hours and had some residual effect for days. The district court could properly make the factual finding that this was painful and obvious.

The court distinguished <u>Lancaster</u> on the grounds that the injury suffered by the security guard was only momentary.

These two cases demonstrate the necessity of sentencing courts making a factually specific inquiry in each case as to whether the injury was "painful and obvious," was "of a type for which medical attention ordinarily would be sought," or was more than insignificant for some other reason. The degree of injury from mace will differ depending on such factors as the strength of the particular product used, the distance between the victim and the dispenser, and the angle of delivery. Accordingly, there will undoubtedly be crimes involving the use of mace where no "bodily injury" will occur, just as there will be such crimes where a victim will experience such injury.

We are thus unable to sustain the district court's assignment of two points under § 2B3.1(b)(3)(A) based on its conclusion that "a victim of mace sustains a significant injury." Nor can we uphold its assignment based on the court's reference to "immediate medical attention." The FBI agent did not know, and the record does not otherwise reveal, the character of the attention given by the paramedics to the tellers, and we agree with the <u>Lancaster</u> court that not all contact between a victim

and a health care professional will justify a conclusion that "bodily injury" occurred. The example relating to medical attention in the definition of "bodily injury" is intended to provide an objective basis for distinguishing significant from insignificant injuries. If, as in Lancaster, medical attention would be sought by an ordinarily prudent person for the purpose of diagnosis but no treatment ensues, that attention does not help to establish the significance of the injury. Lancaster, 6 F.3d at 210.

The record also does not disclose anything about the degree of pain experienced by the tellers. Moreover, while a trier of fact might conceivably draw an inference from the FBI agent's testimony that they had injuries obvious to an observer, this is not a necessary inference and it is not one that the district court drew.

On remand, the district court should determine the character and duration of the symptoms experienced by the tellers, as well as the character of the "medical attention" they received. Only then will it be in a position to determine whether Harris' mace inflicted "bodily injury" within the meaning of § 2B3.1(b)(3)(A).

We add one final note for the guidance of the district court when it reevaluates the available reliable evidence and makes its findings. We do not read the Guidelines, as did the Lancaster court, to require that an injury be painful and obvious for a substantial period of time in order to qualify as a "bodily injury." See Lancaster. 6 F.3d at 210 & n.2. Moreover, we think

it likely that cases involving mace will arise in which a finding of bodily injury will be appropriate despite the absence of prolonged effects. Our thought can be illustrated by reference to the promotional literature for Phaser Mace. As we have suggested, given their source and purpose, a trier of fact should take the claims in Phaser's promotional literature about its immediate effects with a "grain of salt." Nevertheless, if the record in a case established that a maced bank teller had symptoms accurately described by those claims for a period of more than a moment or two, we believe a district court would be justified in concluding that he or she had received a "bodily injury." A blow the effects of which can be shaken off in a moment or two may well be an insignificant injury. Blindness, disorientation, breathing difficulty, and extreme discomfort sufficient in combination to induce panic for a period of ten to fifteen minutes are something else entirely and can rationally be viewed as more than an insignificant injury.

## VII.

The judgment of the district court will be reversed and this matter will be remanded for resentencing only.